OPINION
{¶ 1} Defendant-appellant, Shawn Drew ("appellant"), appeals from the judgment of the Franklin County Court of Common Pleas, whereby a jury convicted appellant of two counts of abduction, third-degree felonies, in violation of R.C. 2905.02, four counts of rape, first-degree felonies, in violation of R.C. 2907.02, and one count of felonious assault, a second-degree felony, in violation of R.C. 2903.11. For the following reasons, we affirm that judgment. *Page 2 
 {¶ 2} The following is a recitation of the facts relative to appellant's convictions, which were adduced at trial. Additional facts will be discussed as they concern each assignment of error. Appellant and the victim, A.S., dated during high school in the late 1980's. After high school, the couple lost touch until October 2005, when A.S. contacted appellant. They met again in person in November, and by December, the two began dating. In January 2006, A.S. discovered that she was pregnant, which was a cause of concern because she suffered from a blood disorder that would cause her pregnancy to be high-risk. Additionally, A.S. was a parochial school teacher and was unsure if her status as an unwed mother would jeopardize her employment.
 {¶ 3} The couple's harmonious reunion was short lived. Appellant became violent with A.S. over the Martin Luther King holiday weekend; he "bit [her on her] face," leaving teeth marks and breaking the skin on her left cheek." (Tr. at 82.) Appellant was apologetic afterwards, but when A.S. indicated that she was not going to accept his apology, he "became even more enraged and told [A.S.] that he was going to scar [her] for life and that [she] better never tell anyone." Id. at 83. He also became "suddenly suspicious" and jealous. Id. at 84. His anger became "increasingly more unpredictable" and "would say and do" things that seemed "out of character" and "odd." Id. at 84. He threatened to hurt A.S., as well as members of her family, and told her that if she tried to keep him out of their baby's life, he would hurt both her and the baby.
 {¶ 4} Appellant's grandmother died in late January 2006. Because of the situation created by appellant's violence, A.S. did not think she should attend the funeral. Appellant called A.S. and told her that he needed to retrieve his shoes from her apartment, and instructed A.S. to meet him at his aunt's house, where she was to wait for *Page 3 
his call. A.S. did as he said, but after waiting for over an hour without a call from appellant, she left and went to her twin sister's house to celebrate their birthday. Later that evening, appellant called A.S. and told her to come pick him up, which she did. Appellant was upset, and, while en route to A.S.'s apartment, he expressed his "displeasure" with her over her decision not to attend his grandmother's funeral. Id. Once at the apartment, appellant became physically violent. He began "yelling, telling [her] he was going to kill [her]." Id. at 99. He went into the kitchen, retrieved a knife, and threatened her with it, describing in detail how he was "going to gut" her. Id. During this episode, appellant hit her, pulled her hair, and, all the while, kept repeating that he would kill her. Appellant reiterated that if A.S. had any intention of not letting him have contact with the baby, then "he would hurt the baby, and [she] wouldn't have the baby at all." Id. at 100. The situation finally de-escalated when appellant fell asleep. A.S. did not call the police because she was afraid. She explained at trial that she "had seen him evolve into this person that was very aggressive and very intimidating and he was so descriptive" in his threats that A.S. "absolutely believed" that appellant would follow through. Id. at 104.
 {¶ 5} A.S. remained in the relationship out of fear, nor did she know how to safely extricate herself. Around mid-February, appellant accompanied her to an obstetric appointment, after which, she dropped appellant off somewhere and proceeded to work. Late that evening, appellant called A.S. and was very upset. He told her to pick him up, which she did. In the car, he told her that she needed to withdraw money from her account because "someone accused him of stealing money," and even though he denied having done so, he needed to replace the money because "this person knew where his family lived and they would hurt his family." Id. at 112. After trying several ATMs, and *Page 4 
waiting for A.S.'s paycheck to appear in her account, A.S. was able to withdraw money for appellant. By that time, it was early morning, so A.S. went to work.
 {¶ 6} After work, A.S. went to her sister's house to baby-sit. Having not gotten any sleep the night before, and tired from her pregnancy, A.S. fell asleep at her sister's house. In the morning, when she plugged in her cell phone to recharge in the car, her phone immediately rang-it was appellant. He told her that he needed a ride and instructed her to pick him up. Appellant was angry when he got in the car, and directed A.S. to take him back to her apartment.
 {¶ 7} Once in the apartment, appellant locked the door and began yelling at A.S. She testified that his speech was incoherent and he "wasn't making any sense." Id. at 125. He told her to go to her bedroom, where he forced her to perform oral sex. While doing so, appellant hit A.S. about the face, and, at some point, told her that "he had seen someone who had a hamburger, and based on the toppings on this hamburger," he knew that A.S. had cheated on him. Id. at 127. In an attempt to get appellant to stop, A.S. told appellant that she had a parent/teacher conference at school, so she had to go, but he would not let her leave. Appellant continued to hit A.S. about her head, causing her to bleed. He then made her call into work and explain that she could not attend the conference. After she made the call, appellant went in to the kitchen, retrieved a knife, and threatened to kill A.S. with it. He also told her that he was going to "check [her] to see if [she] had been unfaithful." Id. at 131. Appellant then inserted his fingers into A.S.'s rectum, and, while doing so, continued to rant and rave. The situation eventually de-escalated when appellant fell asleep. When he awoke, appellant refused to talk about what had transpired and demanded that A.S. take him home. *Page 5 
 {¶ 8} The next day, appellant called A.S. and directed her to pick him up. Once in the car, appellant told A.S. to take him to her apartment. A.S. complied with appellant's directive because she was "afraid that if [she] didn't that he would murder [her]." Id. at 140. While at her apartment, appellant again forced A.S. to perform oral sex on him, and, like the day before, hit her about the head. A.S. testified that appellant hit her with such force that she fell down and "everything [went] black." Id. at 144. When she came to, her right ear hurt "really bad" and she could not hear out of it. Id. at 145. When A.S. told appellant that she could not hear, he proceeded to anally rape her. A.S. testified that while appellant was raping her, he said, "you don't think I'm going to let you do something with somebody else that you haven't done with me," which, A.S. explained at trial, she "realized at that point what he was suspicious of [her] doing all along was what he was doing to [her]." Id. at 147.
 {¶ 9} A.S. told appellant that her roommate would be coming home soon, which brought that incident to an end. Appellant then had A.S. drive him to a restaurant parking lot, and, while sitting in the car in the parking lot, A.S. told appellant that she needed to go to the hospital to get her ear checked out. Appellant told A.S. that she needed to calm down. He then became angry, and threatened to "scar [her] for [life]" because he did not want to have his plans for that day disrupted with a detour to the hospital. Id. at 150. Later on, A.S. finally was able to go to the emergency room, where she was diagnosed with a perforated eardrum.
 {¶ 10} A.S. testified that she disclosed to a friend and a cousin some of what had been transpiring with appellant. Her cousin helped her put together a bag of items that A.S. could take with her on a moment's notice in case she needed to leave. *Page 6 
 {¶ 11} A.S. saw appellant after the incident involving the anal rape. Appellant called A.S. to pick him up, which she did, and testified that she complied with his demand out of fear. Appellant wanted to go back to A.S.'s apartment, but A.S. told appellant that they could not go there because her sister and her family were over using her computer. Appellant then directed A.S. to drop him off, and instructed her to call him when her sister left. For the remainder of that evening, appellant incessantly called A.S. on her cell phone; his pattern was to call, hang up, and call back again, which he did "over and over." Id. at 159.
 {¶ 12} A.S. saw appellant for the last time when she picked him up and took him to a pre-existing doctor's appointment. She testified that she did so because she felt like she was "buying time." Id. A.S. went to work following appellant's doctor's appointment, after which, she went to her apartment, gathered some clothes, and stayed at a friend's house. A.S. testified that, over the course of the evening, appellant called her "hundreds of times." Id. at 162.
 {¶ 13} The following day, A.S. went to the City Prosecutor's office to see about filing charges relating to the physical assault. A.S. did not disclose the sexual assaults because she was afraid, reasoning that because her friends and family had seen the physical "marks" on her, then if appellant took retribution for her going to the police, then "possibly it wouldn't be as bad as if [she] told everything." Id. at 163-164.
 {¶ 14} Within the week, Detective David Phillips ("Detective Phillips"), an 11-year veteran with the Columbus Police Department, contacted A.S. and arranged an interview. Detective Phillips met with A.S. for over two hours, during which she appeared "distraught, upset, scared." Id. at 385. A.S. told Detective Phillips about the physical *Page 7 
abuse, and, although she did not disclose the details of the sexual abuse, she mentioned that appellant had abused her in that manner as well. According to Detective Phillips, A.S. did not describe the nature of the sexual abuse because "she said she was afraid." Id. at 386.
 {¶ 15} After meeting with A.S., Detective Phillips interviewed appellant, who denied the allegations. Appellant told Detective Phillips that A.S. was on drugs and further asserted that she was using her friend, a police officer with whom appellant stated A.S. was romantically involved with, to create trouble for him. Appellant also told Detective Phillips that A.S. had engaged in what he called "sexcapades," a term appellant used to describe A.S.'s alleged sexual promiscuity with various individuals (all crack users) from his neighborhood. Id. at 396-397. Specifically, he accused her of engaging in anal sex with a variety of individuals, and, when discussing the details with Detective Phillips, appellant became upset and agitated. Appellant provided the names and addresses of some of the individuals with whom A.S. was allegedly consorting, as well as various locations (crack houses and hotels) where A.S. had allegedly been using drugs. He implored Detective Phillips to follow up with the individuals he had identified, test A.S. for drugs, and check her bank account for suspicious withdrawals, because, according to appellant, the results of those investigations would exonerate him. Id. at 397, 410.
 {¶ 16} After appellant's interview, Detective Phillips, did, in fact, look into the accusations appellant made about A.S., none of which, however, were borne out by his investigation. The individuals identified by appellant, and with whom Detective Phillips spoke, did not confirm knowing A.S. When Detective Phillips spoke with A.S. herself, she *Page 8 
denied ever having used drugs, and agreed to provide a sample of her hair for testing. The results were negative. Id. at 259.
 {¶ 17} Detective Phillips interviewed appellant a second time. He denied having sexually assaulted A.S., and reiterated his beliefs that A.S. was a drug user and she was using her police officer friend to harass him. And, as in appellant's first interview, he frequently accused A.S. of engaging in anal sex with others, and became particularly agitated during those parts of the interview.
 {¶ 18} On March 30, 2006, appellant was indicted on two counts of abduction, four counts of rape, and one count of felonious assault. The matter was tried to a jury, which convicted appellant on all counts. The court sentenced appellant to five years for each count of abduction, ten years for each count of rape, and seven years for the felonious assault, with all sentences running consecutively.
 {¶ 19} Appellant filed a timely appeal, advancing six assignments of error. For sake of clarity and ease of discussion, each assignment of error is separately set forth, and our analysis of same immediately follows.
 ASSIGNMENT OF ERROR NUMBER ONE
 THE TRIAL COURT ERRED WHEN IT ALLOWED THE STATE TO PRESENT THE FOLLOWING INADMISSIBLE EVIDENCE: 1) EVIDENCE IMPEACHING THE DEFENDANT ON AN INADMISSIBLE COLLATERAL MATTER AND USING IT TO SHOW THAT IT HAD SCIENTIFIC EVIDENCE PROVING THE DEFENDANT WAS LYING AND THE COMPLAINANT WAS TELLING THE TRUTH, 2) OTHER UNRELATED BAD ACT EVIDENCE USED TO SHOW THAT THE DEFENDANT WAS A THIEF AND ASSOCIATED WITH VIOLENT AND DANGEROUS PEOPLE, 3) IMPROPER CHARACTER EVIDENCE USED TO SHOW THAT THE DEFENDANT WAS MENTALLY UNBALANCED AND PARANOID AND THEREFORE MORE LIKELY TO HAVE COMMITTED THE CRIMES, 4) OPINION EVIDENCE FROM THE *Page 9 
INVESTIGATING DETECTIVE THAT THE COMPLAINANT WAS TELLING THE TRUTH AND THE DEFENDANT WAS LYING.
 ASSIGNMENT OF ERROR NUMBER TWO
 THE DEFENDANT WAS DENIED THE RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL DUE TO THE FAILURES OF COUNSEL TO PROPERLY OBJECT TO PATENTLY INADMISSIBLE EVIDENCE WHICH RESULTED IN AN EXTREMELY UNFAIR TRIAL.
 {¶ 20} We will address these two assignments of error together as they are interrelated. In his first assignment of error, appellant asserts that the trial court erred throughout the trial in this matter in allowing inadmissible evidence presented by the state. And, in his second assignment of error, appellant contends that his trial counsel was ineffective for failing to object to said evidence.
 {¶ 21} At the onset, we note that appellant's first assignment of error includes constitutional challenges to the admissibility of the statements he made to Detective Phillips. As explained, infra, in our analysis of appellant's sixth assignment of error, we do not find the trial court erred when it denied appellant's motion to suppress. Thus, we shall address the statements with which appellant takes issue as they relate to the Ohio Rules of Evidence.[1]
 {¶ 22} "A trial court has broad discretion in the admission or exclusion of evidence, and its judgment will not be reversed absent a clear showing of an abuse of discretion with attendant material prejudice to the defendant." State v. Rowe (1993), 92 Ohio App.3d 652,665; Krischbaum v. Dillon (1991), 58 Ohio St.3d 58, 66 (stating, in part, that *Page 10 
"[i]n the absence of an abuse of that discretion which results in a material prejudice to a defendant, an appellate court should be slow to reverse evidentiary rulings"). "The term `abuse of discretion' connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable." Blakemore v.Blakemore (1983), 5 Ohio St.3d 217, 219. When applying the "abuse of discretion" standard, an appellate court is not free to merely substitute its judgment for that of the trial court. State v.Sibert (1994), 98 Ohio App.3d 412, 424.
 {¶ 23} Having set forth the parameters of our discussion and the appropriate legal standard, we will discuss each piece of evidence in turn.
A. Appellant's statement to Detective Phillips' that A.S. was a drug abuser and had engaged in sex with other men.
 {¶ 24} During trial, Detective Phillips testified that appellant told him that A.S. was abusing drugs and engaging in "sexcapades." (Tr. at 396.) Appellant argues that this statement was made in response to a question posed by Detective Phillips, which asked appellant to speculate as to why A.S. would make false allegations against him. Appellant asserts that Detective Phillips' testimony was inadmissible because of the way in which the statement was elicited, explaining that "[t]his question and the answer would not be admissible in court because it is highly improper to ask a witness to comment upon the credibility of another witness or to give a speculative answer that is not based on personal knowledge." (Appellant's brief, at 19.) For several reasons, however, appellant's argument fails. *Page 11 
 {¶ 25} To begin, appellant's depiction of this statement's factual backdrop is inaccurate. This statement did not first arise in response to a question posed by Detective Phillips, but, rather, appellant offered this statement without prompting within the first 15 minutes of his March 12, 2006 interview with Detective Phillips. After appellant voluntarily detailed how A.S. was allegedly using her friend, who was a police officer, to make trouble for him, appellant then stated, "I'll tell you exactly what it is man, the young lady has a drug habit." State's Exhibit 2.
 {¶ 26} Regardless of the setting, appellant's statement is admissible under Evid. R. 801(D)(2)(a), which provides that a statement offered against a party is not hearsay, even though it is an out-of-court statement, when it is the party's own statement. See, e.g., State v.Byrd (1987), 32 Ohio St.3d 79, 89.
B. The results of A.S.'s hair analysis.
 {¶ 27} Appellant asserts that the admission of the results of A.S.'s hair sample submitted for drug analysis were inadmissible because it was extrinsic evidence used for the purpose of collateral impeachment. According to appellant, the state used this evidence to "scientifically disprove" his statement that A.S. was on drugs, which impermissibly depicted appellant as the liar while portraying A.S. as the truth teller. (Appellant's brief, at 19.)
 {¶ 28} Evid. R. 806(A) provides that "[w]hen a hearsay statement, or a statement defined in Evid. R. 801(D)(2), (c), (d), or (e), has been admitted in evidence, the credibility of the declarant may be attacked, and if attacked may be supported, by any evidence that would be admissible for those purposes if declarant had testified as a witness." Although Evid. R. 806 does not specifically include statements defined in Evid. R. 801(D)(2)(a), the *Page 12 
rule under which appellant's statement came in, it has been held that this rule applies to such statements. See, e.g., State v. Heinish
(1990), 50 Ohio St.3d 231; State v. Tutolo (Mar. 12, 1992), Cuyahoga App. No. 60071; see, also, United States v. Shay (C.A.1, 1995),57 F.3d 126, 132; States v. Velasco (C.A.7, 1992) 953 F.2d 1467, 1473 ("The [Senate Judiciary] committee considered it unnecessary to include statements contained in rule 801(d)(2)(A) and (B) — the statement by the party-opponent himself or the statement of which he has manifested his adoption — because the credibility of the party-opponent is always subject to an attack on his credibility [sic]."), quoting Notes of the Committee on the Judiciary, Rep. No. 1277, 93d Cong., 2d Sess., reprinted in 1974 U.S.C.C.A.N. 7051, 7069 fn.28.
 {¶ 29} Here, throughout appellant's interviews with Detective Phillips, he repeatedly accused A.S. of using drugs, and theorized her alleged drug use was the impetus for her making the allegations against him. In fact, testing A.S. for drugs was appellant's own idea, and he implored Detective Phillips to follow through.[2] In any event, having found appellant's statement admissible, the inquiry under Evid. R. 806 then becomes: if appellant had testified at trial that A.S. was a drug user, would the state have been permitted to impeach appellant with the results of A.S.'s hair sample analysis, which would disprove his testimony? We answer that question in the affirmative, and find the results of A.S.'s hair sample analysis constitute admissible evidence.
C. Detective Phillips' testimony regarding his impression of appellant's mental state. *Page 13 
 {¶ 30} Appellant complains about the following testimony given by Detective Phillips in response to a question posed by the state, which asked Detective Phillips to discuss appellant's agitation during his interview:
 When he would talk about the sex acts, anal sex. He also got agitated when I not [sic] confronted him but when I told him that [A.S.] had suspicions about why his behavior had changed so dramatically over the last couple of months; as far as her suspicions, what it could be related to as far as drug use and things of that nature.
 And then I said that, "She thinks that you might be paranoid. She thinks that you might have some mental instability." When I said, "To be honest with you, what you're saying does sound paranoid," he didn't like that at all.
 You know, he was very agitated that I — after listening to everything he was saying that I mentioned that it did sound paranoid to me, he got particularly agitated.
(Tr. at 410-411.) According to appellant, the above-quoted testimony was "extremely damaging," constituted hearsay, and ran afoul of Evid. R. 404(A).
 {¶ 31} Assuming without deciding that we find the aforementioned testimony was inadmissible, the error was harmless. The Supreme Court of Ohio has held that error is harmless if "there is no reasonable possibility that the evidence may have contributed to the accused's conviction." State v. Bayless (1976), 48 Ohio St.2d 73, paragraph seven of the syllabus. The court has also stated that it is appropriate to find error harmless where there is "either overwhelming evidence of guilt or some other indicia that the error did not contribute to the conviction." State v. Ferguson (1983), 5 Ohio St.3d 160, 166, fn. 5. When considering whether error is harmless, our judgment is based on our own reading of the record and on what we determine is the probable impact the statement had on the jury. See State v. Kidder (1987),32 Ohio St.3d 279, 284. *Page 14 
 {¶ 32} In this case, A.S. testified that appellant had threatened her, had been physically violent, and described having been forced to perform oral sex on appellant, as well as having been forced to submit to anal sex by appellant. In recounting one incidence of physical violence, A.S. testified that while appellant was hitting her, appellant was "growling," not talking in "complete sentences," and told her that he knew that she had cheated on him from looking at the toppings on someone's hamburger. (Tr. at 127.) She also described the change in appellant's behavior towards her as sudden, and "wondered whether or not" appellant had a "mental illness" or had been using drugs. Id. at 107.
 {¶ 33} In addition to A.S.'s testimony, Detective Phillips testified that appellant accused A.S. of having anal sex with a variety of individuals, including his uncle. Detective Phillips also testified that appellant told him that he had once gone to a crack house and knew A.S. was there because he heard her "moaning and groaning" in another room, while she was engaging in anal sex. Id. at 403-404.
 {¶ 34} Based on the nature of the testimonies discussed above, Detective Phillips' specific testimony as challenged by appellant is cumulative evidence, and such evidence is cumulative in its effect. See, e.g., State v. Crawford (Feb. 6, 1986), Franklin App. No. 85AP-324. Thus, assuming Detective Phillips' testimony was inadmissible, we find that its admission was harmless beyond a reasonable doubt given the other admissible evidence establishing appellant's guilt.
D. Detective Phillips' testimony regarding appellant's statement about A.S.'s ultrasound.
 {¶ 35} Detective Phillips testified that appellant told him that A.S.'s obstetric ultrasound depicted "the baby spinning around and around" and attributed the spinning to *Page 15 
A.S.'s "drug use." (Tr. at 419.) Appellant argues that this testimony was inadmissible and introduced as "other act evidence." Contrary to appellant's assertion, as we explained supra, appellant's statement is admissible under Evid. R. 801(D)(2).
E. A.S.'s testimony regarding appellant forcing her to withdraw money from an ATM.
 {¶ 36} During trial, A.S. testified that appellant forced her to withdraw money from her bank account because "someone accused him of having stolen some money," and even though appellant denied the accusation to A.S., he said he needed to replace the money because "this person knew where his family lived and they would hurt his family." (Tr. at 112.) Appellant contends this testimony was inadmissible because it was irrelevant to the charges against him, and was offered for the purpose of establishing that he was a "violent and dangerous criminal" because he "associated with dangerous people who were probably engaged in criminal activity and that he had stolen from them." (Appellant's brief, at 22.)
 {¶ 37} "Evidence of other crimes, wrongs, or acts" may be admissible "as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Evid. R. 404(B). Thus, we previously held that "all of the circumstances" surrounding alleged sexual contact are relevant to the forcible element of rape and related offenses. See State v. Worrell, Franklin App. No. 04AP-410,2005-Ohio-1521, at ¶ 32, reversed on other grounds, In re Ohio Crim.Sentencing Statutes Cases, 109 Ohio St.3d 313, 2006-Ohio-2109; State v.Drayer, 159 Ohio App.3d 189, 2004-Ohio-6120, at ¶ 5, vacating State v.Drayer, Franklin App. No. 03AP-1033, 2004-Ohio-5061. As this court stated in Worrell, "pursuant to Evid. R. 404(B), `evidence of physical, emotional, and verbal abuse upon the victim or other family members, even if not included in the *Page 16 
indictment, has been permitted in numerous jurisdictions in cases involving rape and related sex offenses." Id. at ¶ 32, quoting State v.Madsen, Cuyahoga App. No. 82399, 2003-Ohio-5822, at ¶ 27, quotingState v. Williamson, Cuyahoga App. No. 80982, 2002-Ohio-6503.
 {¶ 38} Because rape cases charged under R.C. 2907.02(A)(2) require proof of force or threat of force, evidence of the defendant's physical and psychological abuse upon the victim is "relevant and probative of a method of control used to force sex upon the victim" and is "inextricably related" to the rape charge. Madsen, supra, at ¶ 28. Likewise, evidence of a defendant's prior physical abuse upon a victim explains the victim's acquiescence to the sexual abuse. State v.Doup, Knox App. No. 02CA000008, 2002-Ohio-6981, at ¶ 48.
 {¶ 39} In this case, the incident in which appellant forced A.S. to withdraw money from her bank account occurred two days prior to the first sexual assault. A.S. testified that appellant was "really frantic to get the money" and "worried that he might escalate into anger towards [her] because of how upset he was." (Tr. at 113-114.) Accordingly, this evidence depicted the use of coercive tactics and pressure that appellant used to rape A.S., and explained her state of mind during the rapes, as well as her submission. Therefore, we conclude that the trial court did not err by admitting this testimony into evidence.
F. Ineffective assistance of counsel.
 {¶ 40} Appellant's trial counsel did not object to the admission of the evidence discussed above, and, as such, appellant contends that he received ineffective assistance of counsel. *Page 17 
 {¶ 41} In order to prevail on an ineffective assistance of counsel claim, appellant must meet the two-prong test enunciated inStrickland v. Washington (1984), 466 U.S. 668, 104 S.Ct. 2052; accordState v. Bradley (1989), 42 Ohio St.3d 136, certiorari denied (1990),497 U.S. 1011, 110 S.Ct. 3258. Initially, appellant must show that counsel's performance was deficient. To meet that requirement, appellant must show counsel's error was so serious that counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment. Appellant may prove counsel's conduct was deficient by identifying acts or omissions that were not the result of reasonable professional judgment. The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance. Id. at 690. In analyzing the first prong of Strickland, there is a strong presumption that defense counsel's conduct falls within a wide range of reasonable professional assistance. Id. at 689. Appellant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. Id., citing Michel v. Louisiana
(1955), 350 U.S. 91, 101, 76 S.Ct. 158.
 {¶ 42} If appellant successfully proves that counsel's assistance was ineffective, the second prong of the Strickland test requires appellant to prove prejudice in order to prevail. Strickland, at 692. To meet that prong, appellant must show counsel's errors were so serious as to deprive him of a fair trial, a trial whose result is reliable. Id. at 687. Appellant would meet this standard with a showing "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694. *Page 18 
 {¶ 43} Here, we found the evidence challenged by appellant as having been properly admitted, with the exception being Detective Phillips' testimony regarding his impression of appellant's mental state, the admission of which we found to be harmless. The failure to raise nonmeritorius objections is not deficient performance, and additionally, appellant cannot show that he was prejudiced by counsel's failure to raise these issues. Thus, appellant has failed to demonstrate that he has received ineffective assistance of counsel.
G. Conclusion.
 {¶ 44} Based on the foregoing, we find appellant's first and second assignments of error to be without merit, and, accordingly, overrule the same.
 ASSIGNMENT OF ERROR NUMBER THREE
 THE TRIAL COURT ERRED WHEN IT ALLOWED THE EXECUTIVE DIRECTOR OF CHOICES TO TESTIFY AS AN EXPERT WITNESS ON DOMESTIC VIOLENCE, OVER STRENUOUS OBJECTION BY THE DEFENDANT, WHEN THE WITNESS HAD NO PERSONAL KNOWLEDGE OF ANY FACTS OF THE CASE AND WHEN HER TESTIMONY WAS NOT AT ALL RELEVANT AND WAS MERELY DESIGNED TO PORTRAY BATTERS AS DANGEROUS AND VIOLENT INDIVIDUALS WHO MUST BE STOPPED TO KEEP THEM FROM KILLING OR HARMING VICTIMS AND THE FAMILIES, FRIENDS, AND PETS OF THE VICTIMS.
 {¶ 45} In this assignment of error, appellant argues that the trial court abused its discretion in allowing Gail M. Heller ("Heller"), Executive Director of CHOICES for victims of domestic violence, to testify as an expert regarding victimization because her testimony was offered for impermissible purposes, i.e., to provide "improper profile testimony" and "portray people accused of domestic violence as extremely bad people while making the victims appear to be rather helpless and sympathetic and deserving of all the protection *Page 19 
that jurors can provide them." (Appellant's brief, at 28-29.) Appellant explains that A.S. did not prolong a delay in reporting the alleged incidents of physical abuse, but she did delay in reporting the alleged sexual abuse. Thus, appellant asserts that a domestic violence expert was not "required to explain the reasons for an abnormal delay in reporting the abuse" because "the issue affecting [A.S.'s] credibility [was] why she failed to report the sexual abuse * * * when she first reported the physical abuse * * *." (Appellant's brief, at 28.) Moreover, appellant argues that because Heller's testimony did not explain why a victim might delay in reporting allegations of sexual abuse when the victim had reported incidents of physical abuse, her testimony was wholly irrelevant and prejudicial to the point of reversal. We disagree.
 {¶ 46} As previously explained, the admission of evidence, including expert testimony, lies within the sound discretion of the trial court and will not be disturbed on appeal absent an abuse of discretion.Williams, supra; State v. Russell, Franklin App. No. 03AP-666,2004-Ohio-2501, citing Renfro v. Black (1990), 52 Ohio St.3d 27. An abuse of discretion connotes more than a mere error of judgment; it implies a decision is without a reasonable basis and one that is clearly wrong. Blakemore, supra. Thus, as we understand it, the issue presented by appellant's argument under this assignment of error is whether the admission of Heller's expert testimony, which concerned the dynamics of relationships in which domestic violence occurs, in general, was appropriate.[3]
 {¶ 47} In State v. Koss (1990), 49 Ohio St.3d 213, the Supreme Court of Ohio first recognized the admissibility of expert testimony regarding battered-woman syndrome *Page 20 
when in support of a self-defense claim. In State v. Haines,112 Ohio St.3d 393, 2006-Ohio-6711, the court extended its holding inKoss to allow the admission of expert testimony of battered-woman syndrome can be introduced by the state in a domestic violence case to aid the trier of fact in understanding the victim's actions.
 {¶ 48} "If a woman is established to be a battered woman, and the expert is qualified, expert testimony regarding battered-woman syndrome presented in the state's case-in-chief is admissible `to help a jury understand a victim's reaction to abuse in relation to her credibility.'" Caudill, supra, at ¶ 39, quoting Haines, supra, at ¶ 29, 35, citing Koss, supra, at 218.
 {¶ 49} Evidence regarding battered-woman syndrome must be admitted in accordance with the rules of evidence, and "[r]elevance under Evid. R. 401 is the first hurdle to clear." Haines, supra, at ¶ 44. "`Generally, battered woman syndrome testimony is relevant and helpful when needed to explain a complainant's actions, such as prolonged endurance of physical abuse accompanied by attempts at hiding or minimizing the abuse, delays in reporting the abuse, or recanting allegations of abuse.'" Id., quoting People v. Christel (1995), 449 Mich. 578, 580. These apparent inconsistencies may impact a victim's credibility, and, thus, "the prosecution need not wait until rebuttal to present expert testimony on battered woman syndrome." Id., quoting State v. Grecinger (Minn. 1997),569 N.W.2d 189, 193.
 {¶ 50} Although such testimony "can be relevant for explaining a victim's behavior, it cannot be considered relevant if there is no evidence that the victim suffers from battered woman syndrome." Id. at ¶ 46. To be classified as a battered woman, "`the couple must go through the battering cycle at least twice. Any woman may find herself in *Page 21 
an abusive relationship with a man once. If it occurs a second time, and she remains in the situation, she is defined as a battered woman.'" Id. at 49, quoting Koss, 49 Ohio St.3d at 216, quoting Walker, The Battered Woman (1979) at xv.
 {¶ 51} As with all expert testimony, the party seeking to introduce battered woman syndrome evidence must lay a proper evidentiary foundation. This entails "`substantiating that the conduct and behavior of the witness is consistent with the generally recognized symptoms of the battered woman syndrome, and that the witness has behaved in such a manner that the jury would be aided by expert testimony which provides a possible explanation for the behavior.'" Id. at ¶ 47, quoting State v.Stringer (1995), 271 Mont. 367, 378. Succinctly stated, evidence that establishes "the cycles of a battering relationship is appropriate foundation for battered-woman-syndrome expert testimony." Id. at ¶ 48.
 {¶ 52} Even if all the foregoing requirements have been met, a court must still consider whether the expert's testimony poses the danger of unfair prejudice, and, thus violates Evid. R. 403. The court addressed this issue in Haines, and adopted the limited format approach that is used in most other jurisdictions. "Under this approach, experts who are called to testify in domestic violence prosecutions must limit their testimony to the general characteristics of a victim suffering from the battered woman syndrome. The expert may also answer hypothetical questions regarding specific abnormal behaviors exhibited by women suffering from the syndrome, but should never offer an opinion relative to the alleged victim in the case." Id. at ¶ 56, quoting Hawes, Removing the Roadblocks to Successful Domestic Violence Prosecutions: Prosecutorial Use of Expert Testimony on the Battered Woman Syndrome in Ohio (2005), 53 Clev.St. L.Rev. 133, 158. *Page 22 
In addition to limiting the expert's testimony, the Court further advised that "[t]rial courts should tailor the scope of the state's questioning, and should also ensure that jurors are instructed as to the limits of the expert's testimony." Id. at ¶ 57.
 {¶ 53} In this case, a review of the record discloses that the admission of Heller's testimony was proper and the appropriate evidentiary foundation was laid. The state presented sufficient evidence that A.S. was a battered woman. A.S. testified about several incidents of abuse that had occurred during her relationship with appellant, despite which, she remained in a relationship with appellant. We find that this is sufficient to establish that A.S. behaved in a manner consistent with a battered woman.
 {¶ 54} We further find that the trial court properly found that Heller was an expert in the field of domestic violence, and, therefore, she was qualified to provide testimony regarding why a victim might delay in reporting or fully disclosing the details of abuse. Indeed, appellant's trial strategy was to impeach A.S. by suggesting that she had fabricated the incidents of sexual abuse because, although she claimed to be afraid of appellant, she reported the incidents of physical abuse in a timely manner but delayed in reporting the alleged sexual abuse. (Tr. at 470.)
 {¶ 55} Heller testified during the state's case-in-chief, and her testimony complied with the dictates set forth in Haines: she neither expressed an opinion as to appellant's guilt nor did she opine as to whether A.S. suffered from battered-woman's syndrome. Heller explained that abuse in intimate relationships usually follows a pattern known as the "cycle of violence." (Tr. at 503.) She identified the first phase as the "tension building" phase, during which there is a lot of arguing and the victim is "walking on eggshells." Id. That phase "moves into" a violent episode or incident, during which, *Page 23 
"there is a great deal of intimidation and threatening behavior or the victim is actually physically or sexually assaulted." Id. "From there, it moves into" the "honeymoon phase," where the perpetrator may initially apologize, but, eventually, this "becomes less of an apology on the part of the perpetrator of domestic violence and more of a blaming of the victim." Id. at 504. Heller discussed the "power and control wheel," which identified tactics and methods the abuser will utilize to gain power and control. Id. at 506. Such behaviors included: visual intimidation, destruction of property or something of significance to the victim, the use of threats and coercion, including threats with a weapon and threats against the victim's family and friends, financial exploitation, verbal and emotional harassment, blaming the victim, and isolating the victim. Id. at 506-512. She also explained that domestic violence "occurs on a continuum," thus, while it may start out with "verbal and psychological abuse," it tends to "move into more physically violent behaviors," and can also include "sexually abusive behaviors." Id. at 512. According to Heller, a victim may not disclose what is going on because "they're embarrassed and ashamed," and may stay in an abusive relationship out of fear for themselves, their family, and friends. Id. at 513. In fact, Heller noted that fear was the "biggest reason" why a victim stays in the relationship. Id. at 514.
 {¶ 56} A review of Heller's testimony discloses that she sufficiently explained why a victim might delay in reporting incidents of abuse or leaving the abuser, i.e., fear, embarrassment, and shame. And, contrary to appellant's assertion, which we note was not supported by any legal authority, Heller was not required to explain why a victim might report having been physically abused but would delay in reporting having been sexually *Page 24 
abused and/or raped.[4] Rather, it was sufficient that Heller explained why a victim might delay in reporting any abuse. At trial, appellant aggressively highlighted what he felt was an inconsistency in A.S.'s behavior, and, to the extent any inconsistency existed, such was for the trier of fact to determine.[5]
 {¶ 57} Based on the foregoing, we find Heller's expert testimony was relevant and helpful to the jury because it involved matters beyond the jurors' knowledge or experience, dispelled misconceptions common to lay persons, and aided the jury in understanding A.S.'s actions. Therefore, the trial court did not abuse its discretion in allowing Heller's expert testimony. As such, we overrule this assignment of error.
 ASSIGNMENT OF ERROR NUMBER FOUR
 THE TRIAL COURT ERRED WHEN IT ENTERED JUDGMENT AGAINST THE DEFENDANT ON THE CHARGE OF FELONIOUS ASSAULT WHEN THE EVIDENCE WAS INSUFFICIENT TO SUSTAIN THE CONVICTION AND THE CONVICTION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE WHEN THE STATE FAILED TO PROVE THAT THE DEFENDANT KNOWINGLY CAUSED SERIOUS PHYSICAL HARM TO ANOTHER.
 {¶ 58} In this assignment of error, appellant argues that his conviction for felonious assault was based upon insufficient evidence and was against the manifest weight of the evidence. Specifically, appellant contends that a perforated eardrum, accompanied by a temporary, mild hearing loss, does not constitute "serious physical harm" under R.C. 2901.01(A)(5), and, therefore, the state failed to meet its burden in proving the seventh count of the indictment. We disagree. *Page 25 
 {¶ 59} When reviewing the sufficiency of the evidence, an appellate court examines the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. State v. Jenks (1991),61 Ohio St.3d 259, paragraph two of the syllabus. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Id., citingJackson v. Virginia (1979), 443 U.S. 307, 99 S.Ct. 2781.
 {¶ 60} Our function when reviewing the weight of the evidence is to determine whether the greater amount of credible evidence supports the verdict. State v. Thompkins (1997), 78 Ohio St.3d 380, 387. In order to undertake this review, we must sit as a "thirteenth juror" and review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether the trier of fact clearly lost its way and created a manifest miscarriage of justice. Id., citing State v. Martin (1983), 20 Ohio App.3d 172, 175. If we find that the fact finder clearly lost its way, we must reverse the conviction and order a new trial. Id. On the other hand, we will not reverse a conviction so long as the state presented substantial evidence for a reasonable trier of fact to conclude that all of the essential elements of the offense were established beyond a reasonable doubt.State v. Getsy (1998), 84 Ohio St.3d 180, 193-194. In conducting our review, we are guided by the presumption that the jury "is best able to view the witnesses and observe their demeanor, gestures and voice inflections, *Page 26 
and use these observations in weighing the credibility of the proffered testimony." Seasons Coal Co. v. Cleveland (1984), 10 Ohio St.3d 77, 80.
 {¶ 61} As germane to this case, to prove felonious assault, the state must show that appellant knowingly "caused serious physical harm" to A.S. R.C. 2903.11(A)(1). "Serious physical harm" is defined in R.C. 2901.01(A)(5) as meaning "[a]ny physical harm that involves some permanent incapacity, whether partial or total, or that involves some temporary, substantial incapacity." When a victim's injuries are serious enough to cause her to seek medical treatment, the jury may infer that the victim suffered serious physical injury. State v. McCoy (Sept. 7, 2000), Franklin App. No. 99AP-1048, citing State v. Winston (1991),71 Ohio App.3d 154; see, also, State v. Sandridge, Cuyahoga App. No. 87321,2006-Ohio-5243; State v. Witt, Williams App. No. WM-04-007,2005-Ohio-1379; State v. Barnd (1993), 85 Ohio App.3d 254
 {¶ 62} In this case, the state presented evidence that appellant caused harm to A.S. Specifically, A.S. testified that appellant had hit her in the head with such force that she fell down and "everything [went] black." (Tr. at 144.) When she awoke, she felt dizzy, her right ear hurt "really bad," and she could not hear out of that ear. Id. at 145. Because of the force with which she fell, A.S. testified that she was "worried about the baby." Id. at 149.
 {¶ 63} A.S. sought medical treatment for her ear at Riverside Hospital's emergency room, and, subsequently treated with Dr. Daniel G. Jackson, an otolaryngologist. Dr. Jackson diagnosed A.S. with having a perforated eardrum and a mild hearing loss. He testified that when A.S. first saw him, she had a "significantly large *Page 27 
perforation," and while he was "hopeful that it would heal," he was "not certain" that it would. Id at 182. Eventually, however, A.S.'s ear did heal, and her hearing was restored.
 {¶ 64} Upon viewing the evidence in the light most favorable to the state, we find sufficient evidence was presented in order to sustain a conviction for felonious assault. McCoy, supra; Winston, supra; see, also, Richards v. Georgia (Ga.App.1996), 222 Ga.App. 853, 854 (court rejected argument that a perforated eardrum did not constitute substantial physical harm). We further find that the record contains substantial evidence upon which the jury could reasonably conclude that appellant caused serious physical harm to A.S. Id.; see, also, State v.Beasley, Cuyahoga App. No. 88989, 2007-Ohio-5432, at ¶ 28 ("It is clear that loss of hearing is a temporary, substantial incapacity."). Thus, we conclude that appellant's conviction for felonious assault is not against the manifest weight of the evidence, and the jury did not lose its way in finding appellant guilty of that offense. Accordingly, appellant's fourth assignment of error is overruled.
 ASSIGNMENT OF ERROR NUMBER FIVE
 THE TRIAL COURT ERRED IN IMPOSING CONSECUTIVE SENTENCES BECAUSE THE ONLY STATUTORY AUTHORITY FOR IMPOSING CONSECUTIVE TERMS WAS HELD TO BE UNCONSTITUTIONAL IN STATE V. FOSTER (2006), 109 Ohio St.3d 1.
 {¶ 65} In this assignment of error, appellant challenges the trial court's authority to sentence him to consecutive prison sentences. Specifically, appellant argues that State v. Foster, 109 Ohio St.3d 1,2006-Ohio-856, certiorari denied (2006), 127 S.Ct. 442, by severing R.C. 2929.14(E)(4), eliminated the trial court's authority to impose consecutive prison terms. We disagree. This court has also recently considered and rejected this argument. See, e.g., State v. White, Franklin App. No. 07AP-743, 2008-Ohio-701; State *Page 28 v. Jordan, Franklin App. 07AP-52, 2007-Ohio-5097; State v. Worrell, Franklin App. No. 06AP-706, 2007-Ohio-2216. Trial courts have long possessed the inherent power to impose consecutive prison terms, even without statutory authority. Worrell, supra, at ¶ 11, quotingHenderson v. James (1895), 52 Ohio St. 242, 254-255. Foster did not eliminate this inherent authority to impose such sentences. SeeFoster, supra, at ¶ 99 ("After the severance, judicial fact-finding is not required before imposition of consecutive prison terms."). Accordingly, because the trial court had authority to impose consecutive prison terms, appellant's fifth assignment of error is overruled.
 ASSIGNMENT OF ERROR NUMBER SIX
 THE TRIAL COURT ERRED WHEN IT OVERRULED THE DEFENDANT'S MOTION TO SUPPRESS THE STATEMENTS OF THE DEFENDANT WHEN THE STATE FAILED TO ESTABLISH THAT THE STATEMENTS WERE MADE KNOWINGLY AND VOLUNTARILY AND WHEN THE STATEMENTS WERE MADE IN VIOLATION OF THE DEFENDANT'S MIRANDA RIGHTS AND HIS RIGHT TO COUNSEL.
 {¶ 66} In this assignment of error, appellant contends that the trial court erred when it denied his motion to suppress statements he made to Detective Phillips. We disagree.
 {¶ 67} The denial of a motion to suppress involves a mixed question of law and fact. When considering a motion to suppress, the trial court assumes the role of trier of fact, and, therefore, is in the best position to resolve questions of fact and evaluate the credibility of witnesses. State v. Mills (1992), 62 Ohio St.3d 357, 366. Consequently, in our review, this court must accept the trial court's findings of fact if they are supported by competent, credible evidence. State v.Fanning (1982), 1 Ohio St.3d 19; State v. Guysinger (1993),86 Ohio App.3d 592, 594. However, this court determines as a matter *Page 29 
of law, without deferring to the trial court's conclusions, whether these facts meet the applicable legal standard. State v. Vance (1994),98 Ohio App.3d 56, 58, quoting State v. Williams (1993),86 Ohio App.3d 37, 41; State v. Klein (1991), 73 Ohio App.3d 486, 488.
 {¶ 68} In this case, appellant was interviewed by Detective Phillips on two occasions: March 12, 2006 and March 18, 2006. Appellant's motion to suppress asserted, inter alia, that Detective Phillips had interrogated appellant prior to advising him of his Miranda rights, and that the interrogation should have ended when appellant refused to sign the waiver form. Appellant claimed the foregoing violated his constitutional rights, and, as a result, the statements he made to Detective Phillips should have been suppressed. The trial court held a hearing on appellant's motion on April 16, 2007, and the parties stipulated to the admission of State's Exhibit 2, an audio CD of the March 12, 2006, interrogation. After listening to the audio CD, the trial court made the following findings:
 THE COURT: I've had an opportunity to listen to the CD recording of the interview that was conducted on this matter. I am going to overrule the motion to suppress.
 It appears to me that comments that were made by detective Phillips were very typical comments that, you know, in my experience are made in terms of — especially the initial comments about letting the Defendant know why he was there, what the potential charges were, and the fact that Mr. Drew started speaking to him at that point.
 Further into the recording, the detective clearly indicates that if he wants his attorney, he'll just stop everything right there. Even at the very beginning of this, there was a comment made — and while I will acknowledge it wasn't certainly a complete Miranda advisory, he did make the comment that, "You know, Mr. Drew, you have the right to remain silent, you don't have to talk to me." *Page 30 
 So, I think that given the totality of the circumstances of this matter, the Court will overrule your motion to suppress the statements.
(Tr. at 42-43.)
 {¶ 69} On appeal, appellant argues that his motion to suppress should have been granted because: (1) Detective Phillips interrogated appellant after counsel had been appointed to represent appellant at his arraignment; and (2) Detective Phillips interrogated appellant before advising him of his Miranda rights. Thus, appellant asserts that his statements to Detective Phillips were not made knowingly, voluntarily, and intelligently, and buttresses this argument with the fact he did not sign the waiver form.
 {¶ 70} The state contends that appellant never specifically requested counsel, and, therefore, the trial court did not err in denying his motion to suppress. Further, the state asserts that appellant's motion to suppress only concerned whether he waived his rights, which implicates the Fifth Amendment, and not the argument that the appointment of counsel to appellant at his arraignment precluded any contact by or discussion with Detective Phillips, an argument based on the Sixth Amendment. As such, the state contends that appellant has waived the latter.
 {¶ 71} We will first address appellant's argument that his Fifth Amendment rights were violated. Appellant's argument addresses both the voluntary nature of his statements and whether he voluntarily waived hisMiranda rights. Although appellant's argument blurs the distinction, whether appellant's statements were voluntary is analytically different than whether he voluntarily waived his Miranda rights. State v.Underdown, Franklin App. No. 06AP-676, 2007-Ohio-1814. *Page 31 
 {¶ 72} The burden is on the prosecution to prove that appellant made a knowing, intelligent and voluntary waiver of constitutional rights. InMiranda, the United States Supreme Court held that interrogation of a suspect in police custody entails certain procedural safeguards, now commonly known as Miranda warnings, to protect a suspect's Fifth and Fourteenth Amendment privilege against self-incrimination.Miranda, at 444. Further, the custodial statements of a defendant may not be used against him in a subsequent criminal proceeding unless the prosecution can demonstrate that: (1) defendant was given theMiranda warnings; and (2) thereafter made a knowing and intelligent waiver of his Fifth Amendment right against self-incrimination. Id. at 479.
 {¶ 73} An accused's statement may not be used against him if the statement itself is proved to be involuntary. State v. Kassow (1971),28 Ohio St.2d 141, paragraph one of the syllabus; Spears v. State (1853),2 Ohio St. 583, 585; State v. Edwards (1976), 49 Ohio St.2d 31, 39, citingBram v. United States (1897), 168 U.S. 532, 542, 18 S.Ct. 183
(confession must be voluntary). The basic test for voluntariness is whether the statement is the product of a rational intellect and a free will. Mincey v. Arizona (1978), 437 U.S. 385, 398, 98 S.Ct. 2408;Columbus v. Stepp (Oct. 6, 1992), Franklin App. No. 92AP-486 (question is whether the confession is the product of an essentially free and unconstrained choice by its maker). Statements that are volunteered, and in no way responsive to any words or actions on the part of the police, are admissible and do not pose a Miranda issue. Miranda, at 478;State v. Waddy (1992), 63 Ohio St.3d 424, 440 (finding that statements not elicited, but volunteered, are not barred by Miranda).
 {¶ 74} The use of an inherently coercive police tactic during interrogation is a prerequisite to a finding of involuntariness.Underdown, supra, citing State v. Kelso *Page 32 
(Sept. 25, 1997), Franklin App. No. 96APA12-1755. Such tactics include physical abuse, threats, or deprivation of food, medical treatment, or sleep. State v. Weeks (Sept. 18, 2000), Logan App. No. 8-2000-07, quoting State v. Cooey (1989), 46 Ohio St.3d 20, 28. There must not only be police misconduct, but such misconduct must have caused the defendant's confession. Connelly, supra, at 164.
 {¶ 75} To determine voluntariness, the court must look at the totality of the circumstances surrounding the statement and consider such factors as the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement. State v. Edwards (1976), 49 Ohio St.2d 31, at paragraph two of the syllabus. The question of whether a statement is voluntary is a question of law which we review de novo. State v. Patterson, Montgomery App. No. 20977, 2006-Ohio-1422, at ¶ 22.
 {¶ 76} Similarly, a suspect may waive his Miranda rights only if that waiver is done knowingly, intelligently, and voluntarily. State v.Myers, Drake App. No. 1643, 2006-Ohio-1604, at ¶ 65. Whether or not a suspect voluntarily waives his Miranda rights is based on the totality of the circumstances. State v. Clark (1988), 38 Ohio St.3d 252, 261. To determine the voluntariness of a defendant's waiver, the court should consider the following: (1) the age, mentality and prior criminal experience of the defendant; (2) the length and intensity of the interrogation; and (3) the existence of physical mistreatment, threat or inducement by government officials. State v. Brewer (1990),48 Ohio St.3d 50, 58, citing Edwards, paragraph two of the syllabus, vacated as to death penalty, Edwards v. State (1978), 438 U.S. 911, 98 S.Ct. 3147. Second, the waiver must have been made *Page 33 
with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Dailey, supra, at 91.
 {¶ 77} Further, if a suspect requests counsel, all interrogation must cease until an attorney is present or the suspect himself initiates communication. Edwards v. Arizona (1981), 451 U.S. 477, 481,101 S.Ct. 1880; State v. Henness (1997), 79 Ohio St.3d 53, 63. To invoke the right to counsel, a suspect must make a request with enough clarity that "a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." Davis v. United States
(1994), 512 U.S. 452, 459, 114 S.Ct. 2350; Henness, at 63. If the request is ambiguous or equivocal, the police may continue to question the suspect; they need not stop the interrogation to clarify whether the suspect actually invoked his right to counsel. Davis, supra, at 461-462;State v. Jackson, 107 Ohio St.3d 300, 2006-Ohio-1, at ¶ 93.
 {¶ 78} We have reviewed State's Exhibit 2, as well as the transcript of the suppression hearing, and we find that appellant's statements were not obtained in violation of his Fifth Amendment rights. Appellant's recorded interview on March 12, 2006, lasted approximately two hours, and began with Detective Phillips informing appellant that he was being interviewed because the state was investigating additional charges,[6]
but that appellant did not have to talk if he did not want to. For approximately the next 18 minutes, appellant initiated and sustained most of the conversation. During this time, appellant referenced the attorney that had been appointed to him at his municipal court arraignment, but at no time did he expressly request that she be present. *Page 34 
 {¶ 79} When Detective Phillips informed appellant that he would like to read him his rights so that he could ask appellant some questions, appellant became somewhat agitated. Appellant stated that he had been talking to Detective Phillips "voluntarily," but that reading him his rights "sounded a little different" and would be "turning this into" something else; appellant explained that "every time" he had been read his rights he was in "trouble," either being "charged with something or arrested." State's Exhibit 2. Detective Phillips again explained that he could not ask appellant any questions until he had been read his rights and told appellant that if he was uncomfortable proceeding without first talking to his attorney, then he would terminate the interview. Detective Phillips offered to contact appellant's attorney in order to set up another interview, along with the caveat that attorneys, "more than nine times out of ten will not let [the police] talk to anybody and that is not always in the best interest of the person who is being investigated." Id. Appellant again espoused his theory of the case, which was that A.S. was abusing drugs and using her contacts in the police department to harass him, and expressed his desire for the "truth to come out." Id. Detective Phillips explained to appellant that another interview should be set up sooner as opposed to later, as a decision on whether to charge appellant with additional offenses needed to be made. After a few moments of further discussion, appellant told Detective Phillips that he would talk "now." Id. He reiterated his desire for the "truth to come out," and told Detective Phillips that he had a "good feeling about [him]." Id. At that point, Detective Phillips read appellant his Miranda rights, which appellant said he understood. Detective Phillips interviewed appellant for the next hour and a half, and, much like the first 20 minutes of their encounter, appellant carried the conversation. *Page 35 
 {¶ 80} In this case, it should first be noted that appellant does not allege intimidation, coercion, or deception, nor does our review of the record disclose that appellant waived his rights because his "will was overborne" or that "his capacity for self-determination was critically impaired because of coercive police conduct." State v. Nields (2001),93 Ohio St.3d 6, 14; see, also State v. Gapen, 104 Ohio St.3d 358,2004-Ohio-654, at ¶ 53. Although appellant was not read hisMiranda rights until approximately 25 minutes into the interview, the majority of that conversation was initiated and sustained by appellant, who clearly "evinced a willingness and a desire" to talk. Id. In fact, appellant described the statements he made during that time as having been made "voluntarily." State's Exhibit 2. Additionally, when Detective Phillips told appellant that he was going to terminate the interview because appellant appeared to be uncomfortable with having his rights read to him, appellant indicated that he wished to waive those rights and "talk now," and that he had a "good feeling" about him. State's Exhibit 2. After appellant was read his rights, he acknowledged that he understood such rights, and then proceeded to give statements for the next hour and a half. During the interview, Detective Phillips attempted to wrap up the interview several times, but appellant repeatedly reopened dialogue. Appellant's verbal assent to waive his rights and his actions in speaking with Detective Phillips indicate that he voluntarily waived his rights.
 {¶ 81} The totality of the circumstances buttresses that determination. Appellant was 35-years old when he was interviewed, and denied having any mental illness or being under the influence of any substances. In fact, appellant described himself as having "good sense," and stated that he had received "straight As" in school. State's Exhibit 2. Appellant expressed familiarity with his Miranda rights, and has what may be *Page 36 
considered an extensive criminal history. Indeed, it is clear from the interview that the source of appellant's apprehension about having hisMiranda rights read to him stemmed from the fact that "every time" he had had his rights read to him in the past, he was in "trouble," or was being "charged with something or arrested." State's Exhibit 2.
 {¶ 82} We also note that the record does not support appellant's contention that he articulated a desire to have counsel present during the interview. Although appellant stated that he had been appointed counsel, he did not express a desire to have that attorney, or any other attorney, to be present to represent him at the time. Further, even if appellant had invoked his right to counsel, he subsequently initiated further communication with Detective Phillips, and, therefore, waived his constitutional rights. Edwards, supra, at 484-485 ("[A]n accused[,] * * * having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.").
 {¶ 83} Furthermore, to the extent appellant is arguing that any statements given to Detective Phillips prior to being advised of hisMiranda rights tainted any statements made after having been so advised, this argument is without merit. Miranda, supra, at 478. In Oregon v.Elstad (1985), 470 U.S. 298, 105 S.Ct. 1285, the United States Supreme Court held that a failure to administer Miranda warnings does not unduly taint the investigative process to render a subsequent voluntary and informed waiver ineffective. This court has held "the central holding in the Elstad case is that the Self-Incrimination Clause of the Fifth Amendment does not require the suppression of a confession, made after proper Miranda warnings and a valid waiver of rights, solely *Page 37 
because the police had obtained an earlier voluntary but unwarned admission from the suspect." State v. Finfrock, Franklin App. No. 02AP-1006, 2003-Ohio-1661; see, also, In re Hill, Franklin App. No. 03AP-82, 2003-Ohio-6185, at ¶ 13. Since we have already determined that appellant's waiver was voluntary and informed, we find appellant's argument to the contrary is without merit.
 {¶ 84} To summarize our discussion, appellant described hispre-Miranda warning statements as having been made voluntarily, and, when appellant was read his rights, he acknowledged that he understood those rights, which he then chose to waive by speaking with Detective Phillips. Additionally, appellant failed to allege or otherwise indicate how his statements were rendered involuntary by police coercion. Thus, we find that appellant's statements and waiver of rights were voluntary, and appellant's motion to suppress those statements was properly denied.
 {¶ 85} With respect to appellant's argument that his Sixth Amendment right to counsel was violated because Detective Phillips interviewed him after counsel had been appointed at his arraignment, we concur with the state that this argument has been waived. Although appellant's motion to suppress identifies the Sixth Amendment as one of its bases, this argument was neither developed in the body of the motion nor pursued at the hearing. Thus, by failing to pursue this argument at the suppression hearing, appellant abandoned litigation of this issue. State v.England, Franklin App. No. 05AP-793, 2006-Ohio-5087, at ¶ 12-14. We therefore conclude that, for purposes of this appeal, appellant has waived this issue. Therefore, this court need not address this issue here for the first time.
 {¶ 86} Accordingly, we overrule appellant's sixth assignment of error. *Page 38 
 {¶ 87} Based on the foregoing, appellant's six assignments of error are overruled, and the judgment of the Franklin County Court of Common Pleas is hereby affirmed.
Judgment affirmed.
SADLER and FRENCH, JJ., concur.
[1] We also note that although appellant complains about other aspects of witness testimony, he has failed to develop any argument regarding the admissibility of said testimony as required by App. R. 16(A). As such, we decline to discuss appellant's contentions pursuant to App. R. 12.
[2] We note the state's astute observation that "had the detective not had the drug testing completed and the evidence not had been presented, the defendant's argument would have been that the detective failed to do his job and that [A.S.] really was a drug user." (Appellee's brief, at 15.)
[3] "Evidence regarding battered-woman syndrome is not limited to cases where domestic violence is the underlying charge, and does not require a showing that the parties lived together." State v.Caudill, Wood App. No. WD-07-009, 2008-Ohio-1557, at ¶ 41.
[4] Indeed, appellant states in his brief that "[r]ape is an aberrant act * * * ." (Appellant's brief, at 20.)
[5] As an aside, we note that Detective Phillips testified that during his first interview with A.S., she mentioned having been sexually assaulted by appellant, but she was "unwilling to talk about it" because "she was afraid." (Tr. at 386, 450.) Thus, A.S.'s reporting of abuse was not as bifurcated as he asserts.
[6] Detective Phillips conveyed to appellant the nature of the additional charges. *Page 1