[Cite as *State v. [C.W.]*, 2018-Ohio-1479.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | No. 15AP-1024 (C.P.C. No. 14CR-6301) |
| v. | : | (REGULAR CALENDAR) |
| [C.W.], | : | |
| Defendant-Appellant. | : | |

---

# D E C I S I O N

## Rendered on April 17, 2018

---

**On brief:** *Michael DeWine*, Attorney General, *Katherine Mullin*, and *Jocelyn K. Lowe*, for appellee.

**On brief:** *Timothy Young*, Ohio Public Defender, and *Stephen P. Hardwick*, for appellant.

---

APPEAL from the Franklin County Court of Common Pleas

BROWN, P.J.

{¶ 1} Defendant-appellant, C.W., appeals from a judgment of the Franklin County Court of Common Pleas, entered pursuant to a jury verdict, finding him guilty of numerous counts of rape, gross sexual imposition, and sexual battery. For the reasons which follow, we affirm.

{¶ 2} On November 7, 2014, appellant was indicted on a 54-count indictment in Auglaize County, Ohio. The indictment included charges for rape, in violation of R.C. 2907.02(A)(1)(b) and/or (A)(2), gross sexual imposition, in violation of R.C. 2907.05(A)(1) and/or (A)(4), sexual battery, in violation of R.C. 2907.03(A)(1) and/or (A)(5), and one count of pandering sexually oriented matter involving a minor, in violation of R.C.

2907.322(A)(1) and/or (A)(3). Several of the counts included sexually violent predator specifications pursuant to R.C. 2941.148.

{¶ 3} Although the events giving rise to the indictment occurred in Auglaize County, the Auglaize County Court of Common Pleas concluded that a fair and impartial trial could not be held in that court. As such, the court ordered that venue be transferred to Franklin County. A jury trial on the charges commenced October 6, 2015.

{¶ 4} The sole victim of the charges was appellant's stepson, N.F. Appellant married N.F.'s mother, L.A., when N.F. was three or four years old. At that time, appellant and L.A. filed for and received custody of N.F. from his biological father. Appellant and L.A. had a child, C.A.W. who was four and one-half years younger than N.F. The family lived in the country near Wapakoneta, Ohio.

{¶ 5} L.A. worked days as a school teacher, and appellant worked second or third shifts at a factory. As such, appellant would care for N.F. during the day when N.F. was a child. N.F. testified that, even during his early childhood, appellant "always acted like he didn't want [N.F.] there." (Tr. Vol. II at 21.) N.F. recalled being four years old and asking for some shampoo while taking a shower, and appellant walking in and "smack[ing] [N.F.] over the head." (Tr. Vol. II at 16.) When N.F. started kindergarten, he would become "physically sick to [his] stomach knowing [he] was going home" to appellant. (Tr. Vol. II at 23.) N.F. would frequently vomit or urinate himself when he was around appellant. When N.F. vomited or urinated himself, appellant would become upset and spank N.F.

{¶ 6} When N.F. was young, appellant would use just his hand for spankings. As N.F. got older, appellant began to use belts or paddles made out of wood to spank N.F. Appellant would have N.F. watch as he crafted the paddle he was about to use for a spanking. N.F. described how "terrifying" it was knowing "what's coming before it even happens," and how appellant would "drill[] holes in [the paddle] so it was more * * * aerodynamic." (Tr. Vol. II at 37.) During these spankings, appellant "usually would tell [N.F.] to pull down [his] pants and grab [his] ankles, so [N.F.] would be standing up and holding [his] ankles." (Tr. Vol. II at 26.) N.F. had to "take" the spanking "and not fall down when [appellant] hit [him]." (Tr. Vol. II at 26.) N.F. would have to "sit in the bathtub with cold water" after a paddling "to try to keep the swelling and the bruising down." (Tr. Vol. II

at 38.) Appellant would paddle N.F. for any reason or no reason; N.F. often did not know "why [he] was receiving this treatment." (Tr. Vol. II at 27.)

{¶ 7}    N.F. explained how appellant continuously made him "feel worthless." (Tr. Vol. II at 28.) Appellant would tell N.F. that he was "stupid, retarded, dumb, like [his] life didn't matter. Like when he told [N.F. he] never should have been born. Or [he] should have been a come stain on the sheets." (Tr. Vol. II at 28.)   C.A.W. noted that "the verbal abuse" was "almost constant for [N.F.]." (Tr. Vol. III at 20.)

{¶ 8}    One of N.F.'s chores during his middle school years was to "clean up the dog poop area" outside. (Tr. Vol. II at 45.) N.F. once missed picking up a piece, and appellant grabbed N.F. "by the back of [his] neck and he shoved [his] face in the pile of dog poop, and he took his other hand and shoved some in [N.F.'s] mouth, [and] told [him] to eat it." (Tr. Vol. II at 46.) N.F. confirmed that he ate the dog feces. L.A. witnessed this event, and confirmed that appellant "took [N.F.'s] face and shoved it down on the ground in the dog feces and made him eat it." (Tr. Vol. III at 143.)

{¶ 9}    Children services became involved twice during N.F.'s childhood; once due to the extent of bruising N.F. had from a paddling, and once after L.A. came home to find that N.F. had "swelling on his lip and a bruise." (Tr. Vol. III at 79.) Caseworkers from the Auglaize County Children Services department testified at trial regarding the agency's involvement with N.F. during the early nineties. The agency ultimately concluded that, although "there was abuse," the abuse was "not to the point to maintain active involvement with the family." (Tr. Vol. III at 70.) The agency "encouraged the mother to consider alternative babysitting arrangements for her son instead of having [appellant] in charge of him." (Tr. Vol. III at 87.)

{¶ 10} As N.F. got older, the physical abuse became more intense. N.F. recalled appellant pressing pressure points on his body to inflict pain, slamming N.F. against doors, and repeatedly "punching [N.F.] in the chest so [he] would bounce off the door." (Tr. Vol. II at 43.) Appellant once threw N.F. against a door so hard that N.F.'s head hit the door, and N.F. "ended up going to the hospital for stitches in the back of [his] head." (Tr. Vol. II at 43.) N.F. recalled times where appellant would grab him by his "throat and he would hold [him] up against the door, off [his] feet." (Tr. Vol. II at 43.)

{¶ 11} Appellant opened a metal fabrication shop on the family's property around 2000, and N.F. would help appellant in the shop. N.F. explained that, if he did not put the tools away correctly, appellant would "hit [N.F.] over the head, like with his hands, or smack [him] in the face. He would punch [N.F.] in the throat." (Tr. Vol. II at 54-55.) N.F. recalled appellant kicking him "in the groin when [they] were in the shop," hard enough that it left a bruise in that area that lasted "a week or two." (Tr. Vol. II at 55.) N.F. described appellant once hitting him in the shin with a "wrench or tool" and "it left, like, a cartilage or a bone chip or whatever on [his] shin." (Tr. Vol. II at 57.) Appellant once threw "a circular saw blade at [N.F.'s] head. Like it went right by [his] head and it stuck in the wall." (Tr. Vol. II at 61.) C.A.W. noted that appellant told him he threw "saw blades at [N.F.]," and C.A.W. recalled seeing the "circular saw blades" that were "stuck in the drywall and they were still there." (Tr. Vol. III at 22.)

{¶ 12}  When N.F. was around 12 years old, appellant started to sexually abuse him. The first incident occurred on a day when N.F. "stayed home sick from school." (Tr. Vol. II at 80.) Appellant and N.F. were in the living room, and appellant told N.F. to take his clothes off. Appellant "started playing with [N.F.'s] genital area before he started performing oral on [him]." (Tr. Vol. II at 77.) N.F. did not orgasm, and appellant told N.F. that maybe he had not "hit maturity yet, or [he] wasn't old enough to * * * ejaculate." (Tr. Vol. II at 79.) Appellant then "pulled down his pants and he sat on the couch. And then he told [N.F.] to start playing with his penis before he told [N.F.] to perform oral on him." (Tr. Vol. II at 79.) Appellant ejaculated in N.F.'s mouth, and N.F. stated that he was "too afraid to spit it out so [he] swallowed it." (Tr. Vol. II at 79.) N.F. testified to several other instances of fellatio, noting that the "normal routine" was that appellant "performed oral sex on [N.F.] and then [N.F.] would perform oral sex on him."  (Tr. Vol. II at 84.)

{¶ 13}  As time went on, the sexual abuse went further. N.F. explained that, when he was in high school, appellant came into his bedroom and "started with, you know, the usual, him playing with me, performing oral sex on me. He had me perform oral sex on him. But at the same time, same incident, he had told me to bend over the bed while I was standing and he was going to perform anal sex on me." (Tr. Vol. II at 86.) Appellant "put his penis inside of [N.F.'s] ass." (Tr. Vol. II at 86.) Appellant asked N.F. "if he could come inside of [him]," and N.F. was "too afraid to say no, so [he] said yes." (Tr. Vol. II at 87.) N.F. testified

that appellant performed anal intercourse on him several times, and that appellant also had N.F. "perform anal intercourse on him." (Tr. Vol. II at 91.)

{¶ 14} When N.F. was "in either tenth or eleventh grade," L.A. became involved in the sexual abuse. (Tr. Vol. II at 100.) N.F. explained that "[t]he first time it happened" appellant and L.A. had gone out for the night. (Tr. Vol. II at 100.) When they returned, appellant woke N.F. up and explained that L.A. was "in the [bed]room and there was going to be sexual activity of some sort." (Tr. Vol. II at 100.) Appellant took N.F. to appellant's and L.A.'s "bedroom. And [L.A.] was lying on the bed, on her back. And [appellant] told [N.F.] to perform oral sex on her." (Tr. Vol. II at 100.) N.F. did as he was told, and stated that L.A. was "moaning a little and, like, moving her legs a little bit like it was pleasurable" as he performed oral sex on her. (Tr. Vol. II at 102.) Appellant then told N.F. "to perform intercourse on her," but N.F. "could not get erect, and so it did not happen," and N.F. was "sent back to bed." (Tr. Vol. II at 102.)

{¶ 15} N.F. explained that "[a] couple of months" after the first incident, "basically the exact same thing" happened again. (Tr. Vol. II at 103.) On this incident, however, N.F. was "more erect than the previous time" and did have intercourse with L.A. (Tr. Vol. II 104.) N.F. stated that he engaged in sexual activity with appellant and L.A. "at least two more times" after this second incident; N.F. recalled "ejaculating in [L.A.] three times total." (Tr. Vol. II at 104, 106.)

{¶ 16} C.A.W. testified that he recalled being home with his mother, father, and half-brother, and being "told to go upstairs and turn on the music." (Tr. Vol. III at 29.) As C.A.W. went up to his room, he saw appellant, L.A., and N.F. go into appellant's and L.A.'s bedroom. While in his room, C.A.W. "heard [his] mother moaning, making sexual sounds," so he turned "the music off to see if it was actually what [he] was hearing, to confirm it, and it was." (Tr. Vol. III at 29.) C.A.W. recalled a different time when they were all home, and appellant "told [C.A.W.] to go outside and play. And then the three of them walked in the bedroom." (Tr. Vol. III at 30.)

{¶ 17} L.A. testified regarding the sexual conduct that occurred with N.F. and appellant. L.A. stated the first time it happened, she went out to a bar with appellant and came home "drunk." (Tr. Vol. III at 154.) Appellant undressed L.A. in their bedroom, then left and returned with N.F. L.A. stated that appellant told N.F. to touch her breasts, and

then told L.A. to give N.F. "oral sex. [Appellant] then had [N.F.] go down on [L.A.]. [She] witnessed the two of them giving each other oral sex. [Appellant] then showed [N.F.] how to get on top of [L.A.] and told [N.F.] to have sex with [her]." (Tr. Vol. III at 154-55.) L.A. stated appellant was "directing" everyone on what to do. (Tr. Vol. III at 155.)

{¶ 18} Although L.A. testified to this first incident, L.A. stated that over the "years, [she had] just repressed so much in [her] mind, that [she could not] recall what happened on the other occasions." (Tr. Vol. III at 160.) Appellant and L.A. divorced shortly after N.F. graduated from high school and left the home in 2003. A couple of years after the divorce, L.A. told her counselor about what she "did with [her] son," and informed her counselor that the sexual activity with N.F. and appellant occurred "four times." (Tr. Vol. III at 160.)

{¶ 19} L.A. informed the jury that she had been charged with criminal charges resulting from these incidents. Pursuant to a plea bargain, L.A. pled guilty "to three charges of sexual battery, and one charge of obstructing official business," and agreed to testify truthfully in this case. (Tr. Vol. III at 130.)

{¶ 20} Appellant took the stand and confirmed that "[a] lot" of the testimony regarding him "disciplining" N.F. was accurate. (Tr. Vol. IV at 48-49.) Appellant admitted that the "spanking and stuff," and also when he "put [N.F.'s] head against the door, that was physical abuse." (Tr. Vol. IV at 86.) Appellant explained, however, that he was forced to be "the disciplinarian" parent, since L.A. "would not touch him." (Tr. Vol. IV at 54.) Appellant stated he would discipline N.F. by "shov[ing] him down," or "crack[ing] him right upside the temple just to shut him up," but that he never "beat [N.F.] with a fist," never "open-faced him, and [he] never beat him on the body." (Tr. Vol. IV at 57.)

{¶ 21} Appellant testified that N.F. "lied," and that "[t]here was no sexual activities" that ever occurred between him and N.F. (Tr. Vol. IV at 55, 92.)

{¶ 22} N.F. joined the army after he graduated high school and, while in the army, N.F. would call appellant "every once in a while * * * and wanted money." (Tr. Vol. IV at 61.) Appellant testified that "altogether, in between the different times," he sent N.F. "three to four grand." (Tr. Vol. IV at 61.) After N.F. was discharged from the army, he briefly returned to the house in Wapakoneta for a couple of months, and then moved to New Jersey for work. Appellant stopped giving N.F. money when N.F. was in New Jersey. Appellant

stated that "the day [he] quit giving [N.F.] money [they] got in a big argument." (Tr. Vol. IV at 66.) N.F. disclosed the abuse to police after he had moved to New Jersey.

{¶ 23} The jury returned a verdict of not guilty on the pandering charge, and returned verdicts of guilty on the remaining charges. Following a separate hearing, the jury also found appellant guilty of the sexually violent predator specifications. The court imposed an aggregate sentence of 4 consecutive life sentences, plus 105 years in prison to be served consecutively to the life sentences.

{¶ 24} Appellant appeals, assigning the following four errors for our review:

> [I.] [Appellant's] rights to due process and a fair trial were violated when the trial court allowed the State to present cumulative, overly prejudicial evidence about prior bad acts.
>
> [II.] [Appellant's] rights to due process and a fair trial were violated when the trial court allowed the State to cross-examine [appellant] regarding prior bad acts the trial court had previously barred the State from presenting to the jury as they constituted cumulative and overly prejudicial.
>
> [III.] [Appellant] was deprived of his constitutional right to the effective assistance of counsel.
>
> [IV.] The trial court erred in submitting verdict forms for Counts 24, 25, 44, 45, 46, and 47 to the jury as the description on the verdict forms permitted jurors to convict [appellant] on multiple counts for the same conduct. The trial court compounded this error when it sentenced [appellant] on multiple counts for the same conduct and ran those sentences consecutively. Both errors violate double jeopardy protections.

{¶ 25} Appellant's first and second assignments of error both assert the trial court erred by admitting evidence of appellant's prior bad acts. Appellant's first assignment of error concerns the physical abuse evidence; appellant's second assignment of error concerns specific instances of violence.

{¶ 26} A trial court's decision regarding the admissibility of other-acts evidence is an evidentiary determination that rests within the sound discretion of the trial court. *State v. Morris*, 132 Ohio St.3d 337, 2012-Ohio-2407, syllabus. "Appeals of such decisions are considered by an appellate court under an abuse-of-discretion standard of review." *Id.*

" 'Abuse of discretion' has been described as including a ruling that lacks a 'sound reasoning process.' " *Id.* at ¶ 14, quoting *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161 (1990). *See also State v. Brady*, 119 Ohio St.3d 375, 2008-Ohio-4493, ¶ 23.

{¶ 27} Appellant notes his trial counsel did not object to the physical abuse evidence and, thus, waived all but plain error. *State v. Hanna*, 95 Ohio St.3d 285, 2002-Ohio-2221, ¶ 84; Crim.R. 52(B).

{¶ 28} "Generally, extrinsic acts may not be used to prove the inference that the accused acted in conformity with his other acts or that he has a propensity to act in such a manner." *State v. Smith*, 49 Ohio St.3d 137, 140 (1990). However, Evid.R. 404(B) permits other-acts evidence for other purposes, including but not limited to the purposes identified in the rule. *Id. See also Morris* at ¶ 13. The rule provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Evid.R. 404(B). *See also* R.C. 2945.59.

{¶ 29} "Another consideration permitting the admission of certain other-acts evidence is whether the other acts 'form part of the immediate background of the alleged act which forms the foundation of the crime charged in the indictment' and are 'inextricably related' to the crime." *Morris* at ¶ 13, quoting *State v. Curry*, 43 Ohio St.2d 66, 73 (1975). Thus, "[e]vidence of other crimes may be presented when" those crimes tend "logically to prove any element of the crime charged." *State v. Horsley*, 10th Dist. No. 05AP-350, 2006-Ohio-1208, ¶ 24.

{¶ 30} To determine the admissibility of the other-acts evidence, a court must first "consider whether the other acts evidence is relevant to making any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence." *State v. Williams*, 134 Ohio St.3d 521, 2012-Ohio-5695, ¶ 20, citing Evid.R. 401. Second, a court must "consider whether evidence of the other crimes, wrongs, or acts is presented to prove the character of the accused in order to show activity in conformity therewith or whether the other acts evidence is presented for a legitimate purpose, such as those stated in Evid.R. 404(B)." *Id.* Finally, the court must "consider

whether the probative value of the other acts evidence is substantially outweighed by the danger of unfair prejudice." *Id.*, citing Evid.R. 403.

{¶ 31} A number of the rape charges at issue charged appellant pursuant to R.C. 2907.02(A)(2), which provides that "[n]o person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force." "Force" is defined as "any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing." R.C. 2901.01(A)(1).

{¶ 32} To prove the force element of a sexual offense, the state must establish force beyond that force inherent in the crime itself. *State v. Griffith*, 10th Dist. No. 05AP-1042, 2006-Ohio-6983, ¶ 17, citing *State v. Dye*, 82 Ohio St.3d 323 (1998). However, the "force and violence necessary to commit the crime of rape depends upon the age, size and strength of the parties and their relation to each other." *State v. Eskridge*, 38 Ohio St.3d 56 (1988), paragraph one of the syllabus. In cases involving parents or stepparents sexually abusing their children, the force " 'need not be overt or physically brutal, but can be subtle and psychological. As long as it can be shown that the rape victim's will was overcome by fear or duress, the forcible element of rape can be established.' " *Id.* at 58-59, quoting *State v. Fowler*, 27 Ohio App.3d 149, 154 (8th Dist.1985). *See also Griffith* at ¶ 17; *Dye* at 326. *Compare State v. Schaim*, 65 Ohio St.3d 51 (1992), paragraph one of the syllabus.

{¶ 33} Thus, evidence of a defendant's prior acts of violence may demonstrate why a victim's will was overcome by their fear of the defendant, and thereby establish the force element of a rape charge. *See State v. Williamson*, 8th Dist. No. 80982, 2002-Ohio-6503, ¶ 23 (noting the "evidence of the physical violence that occurred in the household [was] relevant to and probative of the method of control used by defendant to rape and sexually abuse the victim"); *State v. Jordan*, 2d Dist. No. 26163, 2016-Ohio-603, ¶ 21 (holding that the "other-acts evidence" of the defendant's violent acts was "relevant to the element of force"); *State v. Scott*, 5th Dist. No. 11CA80, 2012-Ohio-3482, ¶ 28-29 (noting the evidence indicating that the defendant killed the victim's baby sister "was offered to show the victim's state of mind; * * * and why she was in fear of [defendant]," and thus was not "improper propensity evidence, but instead tend[ed] to show an element of the crime [of rape], force").

{¶ 34} N.F. explained he did not want to engage in the sexual acts with appellant, but stated he "never questioned what" appellant told him to do, because if he questioned

appellant that "results to physical violence or physical abuse." (Tr. Vol. II 108.) Thus, the physical abuse evidence demonstrated N.F.'s will was overcome by his fear of appellant, and explained why N.F. did not resist appellant's demands for sexual activity.

{¶ 35} Additionally, during N.F.'s testimony, the court provided the jury with the following limiting instruction:

> Let me just advise you that I have permitted testimony on the direct examination of this witness dealing with alleged prior bad acts on behalf of the [appellant] in this case. I did not admit that evidence to show that [appellant], if he did commit a bad act before, he acted in conformance with that action with respect to [N.F.] and the matters that you are to decide, the sexual-related offenses.
>
> But I have permitted that to be introduced for the purpose of showing [N.F.'s] state of mind and whether he was fearful of [appellant]. So you can only consider it for that purpose and that purpose only.

(Tr. Vol. II at 69-70.)

{¶ 36} We presume the jury followed the court's instruction. *State v. Jones*, 135 Ohio St.3d 10, 2012-Ohio-5677, ¶ 194. Appellant argues the trial court's failure to reiterate the limiting instruction when other witnesses testified to the physical abuse, or to reiterate the instruction in the final jury instructions, amounts to plain error. Although " 'the failure to give any limiting instruction constitutes plain error,' " here the trial court did provide the jury with a limiting instruction the first time the other-acts evidence was presented. *State v. Shaw*, 2d Dist. No. 21880, 2008-Ohio-1317, ¶ 13, quoting *State v. Tisdale*, 2d Dist. No. 19346, 2003-Ohio-4209, ¶ 47 (noting that " '[t]he limiting instruction should be given at the time the "other acts" evidence is received' "). Accordingly, we do not find plain error.

{¶ 37} The evidence of physical abuse was relevant to a fact of consequence, as it established the force element of the rape charges. *Williams* at ¶ 20. The evidence was not presented to prove appellant acted in conformity therewith, and the court instructed the jury the evidence was not to be used for that purpose. *Id.* The probative value of the evidence was not substantially outweighed by the danger of unfair prejudice, and any danger of unfair prejudice was reduced by the court's limiting instruction. *Id.* at ¶ 24.

{¶ 38} Appellant further argues that, even if N.F.'s testimony of the physical abuse was admissible, the additional evidence from L.A., C.A.W., and children services caseworkers regarding the physical abuse deprived him of a fair trial. However, appellant testified N.F. had lied about all of the sexual abuse allegations. The testimony from the other witnesses corroborated N.F.'s testimony regarding the physical abuse and, thus, served to bolster N.F.'s credibility. Evidence which impeaches or bolsters witness credibility "is of consequence to the action because it might determine whether the jury believes a particular witness." *State v. Moore*, 40 Ohio St.3d 63, 65 (1988).

{¶ 39} Moreover, appellant admitted his methods of disciplining N.F. constituted physical abuse. In closing, defense counsel relied on the fact that appellant "freely told" the jury that "his methods of disciplining [N.F.] were not good," to bolster appellant's credibility. (Tr. Vol. V at 94.) The defense also argued the years of physical abuse, coupled with appellant cutting N.F. off financially, provided N.F. with the motivation to fabricate the sexual abuse allegations against appellant. (*See* Tr. Vol. V at 94-95.)

{¶ 40} To the extent that some of the physical abuse evidence may have been unnecessarily cumulative, the admission of such evidence amounts to harmless error. A defendant is entitled to a fair trial, not a perfect one. *State v. Williams*, 38 Ohio St.3d 346, 349 (1988). "The harmless-error doctrine recognizes the principle that the central purpose of a criminal trial is to decide the factual question of the defendant's guilt or innocence," and thus focuses "on the underlying fairness of the trial rather than on the virtually inevitable presence of immaterial error." *Id.* An error is harmless beyond a reasonable doubt when the remaining evidence, standing alone, constitutes overwhelming proof of defendant's guilt. *Id. See also State v. Tucker*, 10th Dist. No. 00AP-670, 2002-Ohio-3274, ¶ 44; *Morris* at ¶ 32; Crim.R. 52(A).

{¶ 41} The evidence of the crimes for which the jury returned guilty verdicts was considerable. In addition to N.F.'s detailed description of each sexual act, L.A. testified to the sexual activity that occurred between herself, N.F., and appellant, and C.A.W. provided circumstantial evidence that sexual activity occurred between appellant, L.A., and N.F. Accordingly, as the record contains overwhelming evidence of appellant's guilt on the sex crimes, any error in the admission of physical abuse evidence was harmless beyond a reasonable doubt.

{¶ 42} Appellant's second assignment of error asserts the trial court erred when it allowed plaintiff-appellee, State of Ohio, to cross-examine appellant about specific acts of violence. Prior to trial, appellant filed a motion in limine asking the court to exclude evidence indicating appellant had molested his sister when they were children, and that he shot and killed a number of family pets. The court addressed the motion on the first day of trial, stating it would "withhold ruling on whether that evidence will be admissible until such time as the State plans on calling the witness to testify." (Tr. Vol. I at 13-14.)

{¶ 43} During appellant's direct examination, appellant stated that, although he "had a temper with [N.F.] or anybody else," he was "not a violent person." (Tr. Vol. IV at 50.) Appellant reiterated on cross-examination that he was not a violent person. (*See* Tr. Vol. IV at 121.) The state asked the court if it could "talk about the acts of violence that [it was] aware of," since appellant had "declared on the stand that he [was] not a violent person." (Tr. Vol. IV at 113.) The court told the state it could inquire about both topics.

{¶ 44} The state asked appellant if he considered shooting animals on his property violence. Appellant responded he "didn't consider it violence," and stated he had shot and killed "[a] couple pets," noting that one was "a rottweiler," and one was a "black lab." (Tr. Vol. IV at 122-23.) Appellant denied that he made N.F. kill his own pet dog. Appellant admitted that he "threw a pitchfork" at some goats, and that he shot "[a] little horse." (Tr. Vol. IV at 123.) Appellant denied ever sexually abusing his sister.

{¶ 45} Although "the prosecution may not initiate questioning to establish a criminal defendant's propensity for violence in a trial for violent offenses," a defendant "may introduce testimony, through himself or others, of a relevant character trait that would tend to prove he acted in conformity therewith on a particular occasion." *State v. Eldridge*, 12th Dist. No. CA2002-10-021, 2003-Ohio-7002, ¶ 41, citing Evid.R. 404(A). "In a trial involving a violent offense, that character trait is typically for peacefulness." *Id.* When a defendant introduces evidence of a particular character trait, "the defendant 'opens the door' for the prosecution, which is then permitted to rebut or impeach this character evidence on cross examination." *Id.* at ¶ 42, citing Evid.R. 405(A). "The cross-examination may include inquiry into relevant specific instances of conduct." *Id.*, citing Evid.R. 405(A).

{¶ 46} Appellant argues he did not open the door for the state to inquire about the specific instances of violence, as the state could have relied on the physical abuse evidence to impeach appellant's claim that he was not a violent person. We disagree.

{¶ 47} Appellant testified there were "things that led up to the temper" he had toward N.F. (Tr. Vol. IV at 51.) Appellant explained that N.F. "lied a lot," and was "cunning. He was good at telling fibs and just get[ting] things going." (Tr. Vol. IV at 55.) Appellant described N.F. as not "a quiet little boy. He had a mouth on him, liked to use it," and stated that N.F. "always challenged" him. (Tr. Vol. IV at 56.) Appellant explained that when N.F. "would want to confront [appellant on] why not to do" something appellant had asked N.F. to do, appellant's "reaction was to discipline him." (Tr. Vol. IV at 57.)

{¶ 48} Thus, appellant testified N.F.'s conduct essentially provoked him to use physically violent means of discipline. Accordingly, when appellant testified that, in general, he was not a violent person, he opened the door for the state to ask about specific instances of violence which were directed toward victims other than N.F. *See State v. Higgins*, 2d Dist. No. 18974, 2002-Ohio-4679, ¶ 39 (noting that "[w]hen Higgins testified that he [was] not a violent person, he put into issue his propensity for violence," and "[e]vidence concerning this trait of his character became admissible").

{¶ 49} Based on the foregoing, appellant's first and second assignments of error are overruled.

{¶ 50} Appellant's third assignment of error asserts he was deprived of his constitutional right to the effective assistance of trial counsel. To establish a claim of ineffective assistance of counsel, appellant must satisfy a two-prong test. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Appellant must show that: (1) defense counsel's performance was so deficient that he was not functioning as the counsel guaranteed under the Sixth Amendment to the United States Constitution, and (2) that defense counsel's errors prejudiced defendant. *Id.* To show prejudice, a defendant must establish a reasonable probability that, but for his counsel's unprofessional errors, the result of the trial would have been different. *Id.* at 694. The failure to make either showing defeats a claim of ineffectiveness of trial counsel. *Id.* at 697.

{¶ 51} In Ohio, a properly licensed attorney is presumed competent. *State v. Monford*, 190 Ohio App.3d 35, 2010-Ohio-4732, ¶ 78 (10th Dist.), citing *Vaughn v.*

*Maxwell*, 2 Ohio St.2d 299, 301 (1965). Matters of trial strategy and even debatable trial tactics do not establish ineffective assistance of counsel. *Id.* at ¶ 79, citing *State v. Conway*, 109 Ohio St.3d 412, 2006-Ohio-2815, ¶ 101.

{¶ 52} Appellant asserts his trial counsel was ineffective in failing to object to the physical abuse evidence, failing to request a limiting instruction for each witness that testified to the physical abuse, and in failing to request a final jury instruction regarding the physical abuse evidence.

{¶ 53} " 'A competent trial attorney may well eschew objecting * * * in order to minimize jury attention to the damaging material.' " *State v. Mundt*, 115 Ohio St.3d 22, 2007-Ohio-4836, ¶ 90, quoting *United State v. Payne*, 741 F.2d 887, 891 (7th Cir.1984). *See also State v. Franklin*, 97 Ohio St.3d 1, 2002-Ohio-5304, ¶ 42 (noting that "[a] reasonable attorney may decide not to interrupt his adversary's argument as a matter of strategy"). "The failure to raise nonmeritorious objections is not deficient performance." *State v. Drew*, 10th Dist. No. 07AP-467, 2008-Ohio-2797, ¶ 43. Furthermore, a defendant must establish that the ultimate outcome of the trial would have been different had the objection been made. *State v. Topping*, 4th Dist. No. 11CA6, 2012-Ohio-5617, ¶ 81.

{¶ 54} Similarly, "the decision not to request a limiting instruction is sometimes a tactical one." *Schaim* at 61, fn. 9. *See also State v. Rawls*, 10th Dist. No. 03AP-41, 2004-Ohio-836, ¶ 42 (noting that counsel may choose not to "request an instruction on other acts evidence" in order "to avoid drawing additional attention to the other acts testimony"); *State v. Griesmar*, 11th Dist. No. 2009-L-061, 2010-Ohio-824, ¶ 33-34.

{¶ 55} The physical abuse evidence was admissible pursuant to the three-part *Williams* test. *Id.* at ¶ 20. The defense also relied on the physical abuse evidence to argue that N.F. had a motive to fabricate the sexual abuse allegations. Accordingly, counsel's choice not to object to the physical abuse evidence, or to request additional limiting instructions on the physical abuse evidence, were tactical decisions which do not support an ineffective assistance of counsel claim.

{¶ 56} Appellant asserts that his counsel was deficient in failing to object during closing argument, "when the State argued that the prior bad acts evidence was proof that 'we' can count on [N.F.]" (Appellant's Brief at 54.) During closing, the prosecutor noted L.A. and C.A.W. had corroborated much of N.F.'s testimony, and that N.F.'s testimony of the

physical abuse was further "corroborated when we got Children's Services records. So what that tells us is that we can count on [N.F.] to give us reliable, accurate history." (Tr. Vol. V at 58-59.)

{¶ 57} A prosecutor may comment in closing arguments on what the evidence has shown and what reasonable inferences the prosecutor believes may be drawn from it. *State v. Lott*, 51 Ohio St.3d 160, 166 (1990). A prosecutor does not improperly vouch for a witness's credibility by arguing that, based on the evidence, a witness was "a reliable witness to the simple events she witnessed, that she lacked any motive to lie, [or] that her testimony was not contradictory." *State v. Green*, 90 Ohio St.3d 352, 373-74 (2000). *See also State v. Clay*, 7th Dist. No. 08 MA 2, 2009-Ohio-1204, ¶ 141 (noting that "[l]imiting objection during closing is a trial tactic to avoid trying to draw attention to statements").

{¶ 58} The prosecutor's comment was not improper vouching. The prosecutor fairly commented on the evidence from L.A., C.A.W., and children services caseworkers, who all corroborated N.F.'s testimony regarding the physical abuse. Counsel was not deficient in failing to object to the comment.

{¶ 59} Appellant asserts defense counsel was deficient in failing to object to the following statement from the prosecutor during closing argument: "I guess in any rape case, the victim has to be lying. Right? Because if the victim is telling the truth, then the defendant has trouble. Right? So every defense in a rape case is the victim is lying, and then" the defense has to "try to scramble to figure out a reason why." (Tr. Vol. V at 109.)

{¶ 60} Counsel was not deficient in failing to object to this statement, as the prosecutor was fairly responding to appellant's testimony that N.F. had lied about the sexual abuse allegations. Moreover, there is no reasonable probability that, had counsel objected, the result of the trial would have been different. *State v. Bradley*, 42 Ohio St.3d 136 (1989).

{¶ 61} Appellant argues that counsel was deficient in failing to object to a comment the prosecutor made during appellant's cross-examination. The state asked appellant if he believed that N.F.'s frequent vomiting and urinating himself as a child were stress related. Appellant stated "[s]omething was going on," and the prosecutor noted "I would agree with that." (Tr. Vol. IV at 96, 97.) This comment did not express any belief "regarding the guilt of the accused." *Lott* at 166. Rather, the statement merely agreed with appellant's response.

Trial counsel could have reasonably chosen not to object to avoid drawing undue attention to the prosecutor's brief and fleeting comment.

{¶ 62} Appellant lastly asserts his counsel was ineffective in failing to object to the verdict forms and in failing to "request neutral language on the verdict forms." (Appellant's Brief at 56.) The verdict forms contained captions to identify which conduct was associated with each count.

{¶ 63} "Verdict captioning [is] not an improper practice." *State v. Himes*, 7th Dist. No. 08 MA 146, 2009-Ohio-6406, ¶ 31. Verdict captioning "avoids problems such as double jeopardy issues in cases of a hung jury on some offenses but not others. It is not deficient performance to fail to object to these labels merely because the indictment did not specify the type of sexual conduct." *Id. See also State v. Harwell*, 2d Dist. No. 25852, 2015-Ohio-2966, ¶ 60 (noting that "[l]abeling verdict forms is a rational way to identify which verdict is for which offense").

{¶ 64} Appellant argues the captions on the verdict forms "insinuate[d] that [appellant] was guilty." (Appellant's Brief at 56.) Appellant identifies the following captions as "inflammatory[:] * * * 'Fellatio-**Victim** on **Defendant**, [L.A.] Present' for Count 49, * * * 'Anal Intercourse – **Defendant on Victim**, Defendant's Bedroom Incident' for Count 27, [and] 'Fellatio – **Defendant on Victim** – 1st Anal Incident' for Count 17." (Emphasis sic.) (Appellant's Brief at 56.)

{¶ 65} The verdict captions reasonably identified the parties involved, the conduct at issue, and the location to identify which acts related to which charge. *See Himes* at ¶ 30-31; *State v. West*, 8th Dist. No. 95331, 2012-Ohio-3151, ¶ 41. Notably, due to the nature of the sex crimes at issue in the instant case, it was necessary to identify which party was performing, and which party was receiving, the sexual conduct at issue. Appellant also fails to identify the language he believes defense counsel should have proffered to the court.

{¶ 66} The verdict captions did not insinuate appellant's guilt. Rather, the captions tracked the evidence presented during trial. If the jury believed the defense's evidence that N.F. had fabricated the allegations, the jury retained its independence to return verdicts of not guilty. *See State v. Amos*, 7th Dist. No. 07 BE 22, 2008-Ohio-7138, ¶ 47. As the language in the verdict captions was not inflammatory, defense counsel was not deficient in failing to object to the verdict forms on that basis.

{¶ 67} Although appellant argues the failures of his trial counsel should be considered cumulatively, because none of appellant's individual claims of ineffective assistance have merit, appellant cannot establish a right to relief simply by joining those claims together. *State v. Dean*, 146 Ohio St.3d 106, 2015-Ohio-4347, ¶ 296.

{¶ 68} Based on the foregoing, appellant's third assignment of error is overruled.

{¶ 69} Appellant's fourth assignment of error asserts the trial court erred in submitting some of the verdict forms to the jury, as the captions on the verdict forms allowed the jury to convict appellant on multiple counts for the same conduct, in violation of double jeopardy.

{¶ 70} The Double Jeopardy Clause of the United States Constitution, applied to the states through the Fourteenth Amendment, and additionally guaranteed by Article I, Section 10 of the Ohio Constitution, protects a defendant against multiple punishments for the same offense. *State v. Ollison*, 10th Dist. No. 16AP-95, 2016-Ohio-8269, ¶ 28. *See also State v. Hall*, 10th Dist. No. 05AP-957, 2006-Ohio-2742, ¶ 16; *Ohio v. Johnson*, 467 U.S. 493, 498 (1984). The General Assembly has codified the Double Jeopardy Clause protection against multiple punishments through the allied offenses statute, R.C. 2941.25. *State v. Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, ¶ 12.

{¶ 71} R.C. 2941.25(A) provides that, where a defendant's same conduct "can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one." Where, however, the defendant's conduct "constitutes two or more offenses of dissimilar import," or "results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them." R.C. 2941.25(B). " '[A] "conviction" consists of a guilty verdict *and* the imposition of a sentence or penalty.' " (Emphasis sic.) *State v. Williams*, 148 Ohio St.3d 403, 2016-Ohio-7658, ¶ 17, quoting *State v. Whitfield*, 124 Ohio St.3d 319, 2010-Ohio-2, ¶ 12. Thus, "once the sentencing court decides that the offender has been found guilty of allied offenses of similar import that are subject to merger, R.C. 2941.25 prohibits the imposition of multiple sentences." *Id.* at ¶ 19.

{¶ 72} Appellant did not object to the language on the verdict forms, or to the court's imposition of sentence. Accordingly, we review for plain error. "Notice of plain error * * * is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Long*, 53 Ohio St.2d 91 (1978), paragraph three of the syllabus. "For a court to notice plain error, the error must be an obvious defect in a trial's proceedings, it must have affected substantial rights, and it must have affected the outcome of the trial." *State v. Steele*, 138 Ohio St.3d 1, 2013-Ohio-2470, ¶ 30, citing *State v. Eafford*, 132 Ohio St.3d 159, 2012-Ohio-2224, ¶ 11. Even if an error satisfies these three requirements, "Crim.R. 52(B) states only that a reviewing court 'may' notice plain forfeited errors; a court is not obligated to correct them." *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002).

{¶ 73} Appellant asserts that "[b]ased on the State's description of the incidents written on the verdict forms to differentiate the Counts, Counts 22 and 23 are the same charges for the same conduct from the same incident as Counts 24 and 25," and that "Counts 34, 35, 36, and 37 are the same charges for the same conduct from the same incident as Counts 44, 45, 46, and 47." (Appellant's Brief at 59.) Appellant further argues the court failed to "merge the sentences for these counts, but imposed multiple punishments for the same conduct." (Appellant's Brief at 59-60.)

{¶ 74} Count 22 charged appellant with rape and Count 23 charged appellant with sexual battery. The caption on the verdict forms for both Counts 22 and 23 was "ANAL INTERCOURSE – DEFENDANT ON VICTIM – VICTIM'S BEDROOM INCIDENT, DEFENDANT EJACULATED ON VICTIM'S BACK." (Verdict Forms, R. at 196-97.) Counts 24 and 25 charged appellant with rape and sexual battery, respectively, and the caption on the verdict forms for these counts was "ANAL INTERCOURSE – DEFENDANT ON VICTIM – VICTIM'S BEDROOM INCIDENT, VICTIM AND DEFENDANT FACING EACH OTHER." (Verdict Forms, R. at 198-99.)

{¶ 75} N.F. explained that, during the first incident of anal intercourse in his bedroom, appellant ejaculated inside of him. N.F. described another incident of anal intercourse occurring in his bedroom where appellant "pulled out and he ejaculated on [N.F.'s] back." (Tr. Vol. II at 89.) This incident supports the charges in Counts 22 and 23. N.F. then described "another time," in his bedroom, on a "different time and day," where

appellant had N.F. "lay on the bed with [his] legs up and [his] butt * * * facing toward the edge of the bed. And then [appellant] was standing, performing anal on [N.F.], and playing with [his] penis at the same time." (Tr. Vol. II at 88.) This incident supports the charges in Counts 24 and 25.

{¶ 76} The trial court merged Count 22 with Count 23, and merged Count 24 with Count 25. (*See* Sentencing Entry at 2.) The court sentenced appellant to ten-year terms of imprisonment on both Count 22 and Count 24, to be served "consecutive with each other and consecutive with all other counts." (Jgmt. Entry at 2.)  As separate conduct supports the charges, the trial court properly merged the lesser-included offenses into the greater offenses, and sentenced appellant only on the greater offenses. Appellant's contentions regarding these charges lack merit.

{¶ 77} Counts 34 and 35 charged appellant with rape and sexual battery, respectively, and the caption on the verdict forms for these counts stated "CUNNILINGUS – TIME WITH THE PILL INCIDENT." (Verdict Forms, R. at 206-07.) Counts 36 and 37 charged appellant with rape and sexual battery, respectively, and the caption on the verdict forms for these counts stated "VAGINAL INTERCOURSE – TIME WITH THE PILL INCIDENT." (Verdict Forms, R. at 208-09.) Counts 44 and 45 charged appellant with rape and sexual battery, respectively, and the caption on the verdict forms for these counts stated "CUNNILINGUS – 3RD INCIDENT." (Verdict Forms, R. at 212-13.) Counts 46 and 47 charged appellant with rape and sexual battery, respectively, and the caption on the verdict forms for these counts stated "VAGINAL INTERCOURSE – 3RD INCIDENT." (Verdict Forms, R. at 214-15.)

{¶ 78} These charges concerned the conduct involving L.A., N.F., and appellant. N.F. testified that "[t]he first time it happened," N.F. performed oral sex on L.A., and appellant instructed N.F. to have intercourse with L.A, but N.F. "could not get erect, and so it did not happen." (Tr. Vol. II at 100, 102.)

{¶ 79} N.F. explained that "[a] couple months" after the first incident, appellant woke N.F. up in the night and told him that L.A. "was waiting for [them]." (Tr. Vol. II at 103.) N.F. explained that he "was instructed to perform oral on her again. * * * And then have intercourse with her, which somewhat happened. [N.F.] had a hard time staying erect again, but more - - [he] was more erect than the previous time." (Tr. Vol. II at 104.)

{¶ 80} N.F. stated that the "third time is when [he] was able to stay erect. And [appellant] instructed that [he] try to come inside [L.A.], which [he] eventually did." (Tr. Vol. II at 104-05.) N.F. explained that, on "the third time," before they "went into the bedroom that time, [appellant] had taken [him] into the kitchen and given [him] a pill with some water." (Tr. Vol. II at 133.) However appellant "explained it," N.F. understood that the pill was to help him "to stay erect." (Tr. Vol. II at 133.) This incident supports the vaginal intercourse charges in Counts 36 and 37.

{¶ 81} N.F. described L.A. performing fellatio on him during a time "when there was a lot of back and forth between [L.A.] performing oral on [N.F.] and [appellant], and [appellant] performing oral on - - on [N.F.] and her, and [N.F.] performing oral on both of them." (Tr. Vol. II at 105.)

{¶ 82} N.F. never testified to cunnilingus preceding the time with the pill incident. However, in the final incident where there was "a lot of back and forth," N.F. testified he performed "oral" on L.A. (Tr. Vol. II at 105.) Notably, Counts 48, 49, 50, 51, 52, and 53 all concern the fellatio that occurred during the back and forth incident, but there is no separate charge for the cunnilingus from that incident. (*See* Verdict Forms, R. at 216-21.) Thus, the cunnilingus from the back and forth incident supports the conduct charged in Counts 34 and 35.

{¶ 83} The conduct charged in Counts 44, 45, 46, and 47 was rape and sexual battery. The cunnilingus and vaginal intercourse N.F. described as occurring during the second incident supports the conduct charged in these counts. In N.F.'s timeline, the third incident was the time with the pill incident. None of the verdict forms relating to the conduct between appellant, L.A., and N.F. contain the caption "2nd incident." (*See* Verdict Forms, R. at 204-22.)

{¶ 84} Accordingly, the caption on the verdict forms for Counts 44, 45, 46, and 47 should have stated 2nd incident rather than 3rd incident; and the caption on the verdict forms for Counts 34 and 35 should have identified the cunnilingus as occurring during the back and forth incident rather than the time with the pill incident. However, the verdict captions at issue do not present the manifest miscarriage of justice necessary to support a showing of plain error. N.F. testified to conduct which supports each of the charges at issue. The trial court also properly instructed the jury as to the elements of each charge. (*See* Tr.

Vol. V at 122-87); *Himes* at ¶ 36-37 (noting that the "verdict form need not state each of the essential elements" of the offense; rather, "this is the function of jury instructions"); R.C. 2945.11.

{¶ 85} Accordingly, because the record contains evidence which separately supports the conduct charged in each count, appellant fails to establish prejudice, and the misstatements in the verdict captions do not amount to plain error. *Compare State v. Brown*, 9th Dist. No. 25077, 2010-Ohio-4453, ¶ 16 (holding that the defendant "forfeited any argument with regard to the verdict form itself by failing to object to it at trial," and the record failed to demonstrate "any prejudice as a result of the incorrect citation included in the caption of the jury's verdict form").

{¶ 86} The trial court merged Count 34 with Count 35, Count 36 with Count 37, Count 44 with Count 45, and Count 46 with Count 47. (*See* Sentencing Entry at 2.) The court sentenced appellant to respective ten-year terms of imprisonment each on Counts 34, 36, 44, and 46, to be served "concurrent with each other, and consecutive with all other counts." (Jgmt. Entry at 2.) Accordingly, as separate conduct supports the counts, the court merged the lesser-included offenses into the greater offenses and sentenced appellant only on the greater offenses. Appellant fails to demonstrate a double jeopardy violation.

{¶ 87} Based on the foregoing, appellant's fourth assignment of error is overruled.

{¶ 88} Having overruled appellant's four assignments of error, we affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

SADLER and LUPER SCHUSTER, JJ., concur.

————————————————