[Cite as *State v. Keen*, 2023-Ohio-4761.]

COURT OF APPEALS
MUSKINGUM COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO | : | JUDGES: |
| | : | |
| | : | Hon. W. Scott Gwin, P.J. |
| Plaintiff-Appellee | : | Hon. Patricia A. Delaney, J. |
| | : | Hon. Andrew J. King, J. |
| -vs- | : | |
| | : | Case No. CT2023-0009 |
| | : | |
| NATHEN KEEN | : | |
| | : | |
| | : | |
| Defendant-Appellant | : | O P I N I O N |


CHARACTER OF PROCEEDING:        Appeal from the Muskingum County
                                Court of Common Pleas, case no.
                                CR2022-0469


JUDGMENT:                       AFFIRMED


DATE OF JUDGMENT ENTRY:         December 27, 2023


APPEARANCES:

For Plaintiff-Appellee:                 For Defendant-Appellant:

RONALD L. WELCH                         CHRIS BRIGDON
MUSKINGUM CO. PROSECUTOR                8138 Somerset Rd.
JOHN CONNOR DEVER                       Thornville, OH 43076
27 North Fifth St., P.O. Box 189
Zanesville, OH 43702

*Delaney, J.*

{¶1} Appellant Nathen Keen appeals from the February 2, 2023 Entry of conviction and sentence of the Muskingum County Court of Common Pleas. Appellee is the state of Ohio.

**FACTS AND PROCEDURAL HISTORY**

{¶2} This case arose on October 19, 2021, when Jane Doe disclosed sexual abuse by appellant, her stepfather.

{¶3} Mary Doe ("Mother") was in a relationship with appellant for nine years and married to him for seven. They have two children together, both boys, and Mother has a daughter from a previous relationship, Jane Doe. The family lived together in Columbus until October 2020, when they moved to a residence in Muskingum County. Mother noted Jane Doe was age 12 when the family moved because Jane's 13th birthday was a month after they moved in. In October 2021, therefore, Jane Doe was age 13.

*Jane Doe discloses to Mother*

{¶4} At that time, Mother worked in Columbus and left the house each day at 6:00 a.m. She would wake Jane Doe before she left, and Jane would get ready to catch the school bus at 6:50 a.m. The two youngest children would get up at 7:00 a.m., after Jane left for school. Appellant was a subcontractor who made his own schedule so he remained in the house in the mornings to help the children get up for school after Mother left.

{¶5} Jane Doe tends to oversleep and Mother frequently calls her on her way to work to ensure Jane is awake. On October 19, 2021, Mother called Jane several times and no one answered. Eventually, appellant answered Jane's phone and said she was

in another room. Mother was not overly concerned because appellant and Jane "didn't get along" for the last two years and minor disagreements in the mornings were not unusual. Appellant and Jane's relationship had gotten noticeably worse in the last six months.

{¶6} On that date, appellant handed Jane the phone and she went into another room to speak to her mother. She said she and appellant got in a fight and she asked Mother to return home. Upon returning to the residence, appellant was outside with the younger children and Jane Doe was inside. Jane got into Mother's car and they left as though Mother was taking her to school, but Jane broke down crying before they were out of the neighborhood. Jane said someone had been touching her sexually; Mother asked who and Jane responded that she didn't want Mother to hate her or appellant. She then stated appellant had been molesting her.

{¶7} Mother testified that in retrospect, she was concerned about appellant's behavior toward Jane for a while, although she never had a reason to call police. Jane went out of her way to avoid being alone with appellant, to the extent that she asked if she could wait for her bus at a neighbor's house. Appellant and Mother were estranged and he rarely slept in her bed; he was usually on the couch. One morning Mother looked for him and found him asleep in Jane's bed. When she asked what he was doing, he didn't answer. Mother found it strange that appellant set alarms on his phone to go off at 3:00 and 4:00 a.m., but didn't think about it because appellant usually slept on the couch.

{¶8} The family's Neighbor testified that she sometimes gave Mother's children rides to school. One day in October 2021, before the disclosure on the 19th, Jane appeared at Neighbor's house unannounced and asked for a ride to school. Neighbor

consented; appellant then texted Neighbor to say Jane might show up and ask for a ride. Neighbor noticed appellant pull into her driveway in his truck to talk to Jane and wondered why he wasn't giving Jane a ride. It was very unusual for appellant to text Neighbor. Neighbor was uncomfortable and suspicious of the situation, especially when appellant texted her again later to ask what she and Jane spoke about. Neighbor told Jane she was always available if Jane needed someone to talk to, but Jane didn't disclose anything that gave Neighbor a reason for concern. Neighbor expressed her concerns to Mother.

*Investigation, forensic interview, and DNA results*

{¶9} In the meantime on October 19, 2021, Mother and Jane continued to school and spoke to Jane's guidance counselor, who called the school resource officer. Deputy Tanner Morton spoke briefly to Mother to understand the allegations and was directed by a detective to collect evidence from the residence. While at the house, Morton encountered appellant and told him to pack belongings to stay elsewhere. Morton asked appellant if he knew of any reason why police would be at the house that day, and appellant responded that he didn't know why Morton was there but Jane Doe was upset about "the way [appellant] woke her up that morning." Morton asked appellant if he "touched [Jane Doe] inappropriately," and appellant responded that he "didn't understand what that meant." T. 329-330.

{¶10} Morton advised Mother to take Jane Doe directly to Nationwide Children's Hospital in Columbus and she did so. Jane met with Michelle Kaiser, a forensic interviewer and licensed professional counselor, at the child assessment center (CAC). Kaiser testified she does not work for law enforcement; she interviews children for the purpose of medical diagnosis and treatment, prior to the child's SANE exam in the case

of suspected sexual abuse. Kaiser is usually the only professional to interview a child victim of sexual abuse so that the child does not have to repeat the details of the abuse. The interview is made available to medical providers for physical and mental health treatment. A written summary of the interview is also sent to the appropriate local children's services agency. Further, Kaiser testified that Nationwide Children's Hospital policy is that a copy of the notes of her interview is made available to the relevant law enforcement agency.

{¶11} Kaiser met with Jane Doe on October 19, 2021, the date of the incident in question. Appellee's exhibit one is the videotape of the forensic interview, which was played at trial over objection as discussed infra. In response to Kaiser's questions, Jane said she has never seen anyone hurt Mother or appellant, but she described behaviors of appellant including punching holes in walls and throwing chairs; one time she saw appellant hit Mother with a pillow.

{¶12} Jane told Kaiser she woke up that morning around 4:45 a.m. to appellant in her bed. He would not leave so she went to her brother's room; she woke up around 6:00 a.m. and appellant was in the room. He was touching her inappropriately and cornered her; specifically, he was touching her breasts, trying to take her underwear off, and forcing her legs apart. Jane said appellant touched her breasts, butt, and vagina with his hands. He tried to put his penis in her vagina and she pushed him off; she bit his shoulder to try to get him to release her but he said, "Do it again, I like it rough." Appellant grabbed her and tried to put his finger in her vagina. She ran to the bathroom but appellant picked her up and carried her back into the bedroom. He wouldn't leave the room when she was trying to change. As she was doing her makeup with her bedroom door shut and locked,

appellant tried to open the door with a butter knife. She said appellant kicked the door repeatedly and kicked it off its hinges. She found her phone and called her mom, who came and picked her up from the house.

{¶13} Jane said these incidents with appellant have been happening for years and appellant threatened to break up with Mother if Jane told anyone. Appellant would touch her with his penis, "hump" her, and attempt to put his penis in her vagina. He would move up and down on her body while she kept her eyes closed. This usually happened while Mother and the younger children were asleep and after Mother went to work because Mother leaves early from the new house.

{¶14} Jane also described three other incidents of touching before the family moved to the Muskingum County house and one incident at the Muskingum house in which appellant's penis was outside of his pants and he asked her to touch it.

{¶15} A forensic scientist from B.C.I. testified that he received an oral swab from appellant and the SANE kit from Jane's examination which contained her underwear. No foreign D.N.A. was detected on Jane's vaginal swabs, but appellant's D.N.A. was detected on the waistband and interior front panel of her underwear. There was a very low amount of foreign D.N.A. on Jane's skin swabs, not enough for comparison. The witness acknowledged that incidental transfer of D.N.A. between household members is well-established and in this case the circumstances of the depositing of the D.N.A. are unknown.

*Jane Doe's testimony*

{¶16} Jane testified for appellee at trial. She acknowledged months of an increasingly fraught relationship with appellant, in which he made her uncomfortable by

texting constantly, asking her to "love him" and "be his girl," which she understood as relentless requests to permit him to sexually abuse her. Appellant promised her gifts such as jewelry, trips, and a phone in exchange for sexual favors and demanded to be added to her SnapChat so she could send him pictures. Jane read numerous text conversations into the record in which appellant asked her to play sexual games with him, to meet him outside Mother's bedroom in the middle of the night, and to allow him to feel her nails against his skin. Jane testified that at first, appellant molested her under the guise of "teaching" her, and as she became increasingly resistant to the abuse as she realized it was wrong, he pushed her constantly to allow him access to her body.

{¶17} In the first month after the family moved to Muskingum County, before Jane turned 13, Jane testified that appellant would get into her bed at night and in the early mornings and touch her breasts and buttocks. He repeatedly asked her to touch his penis and she refused. At least twice, appellant came into her bedroom while she pretended to be asleep and touched her. Appellant threatened that if she told Mother, she would break up the family.

{¶18} In the early morning of October 19, 2021, she awoke to appellant in her bedroom, standing over her naked. She told appellant no and went back to sleep in her brother's bed to avoid appellant. Her brother's bed is small and full of stuffed animals so she would often sleep there to prevent appellant's attentions. Appellant awakened her again by pinning himself against her and her panties were down. Jane fought appellant off, kicking and pushing, and bit him on the shoulder; appellant said, "I like it rough."

{¶19} She broke free and ran to her mother's bathroom where she locked herself in. Appellant forced his way into the bathroom and she ran back to her bedroom.

Appellant forced her legs apart and put his hand on her vagina. He did not succeed in placing his fingers or his penis inside her vagina. The incident ended when appellant told Jane to get ready for school. Jane was upset and called her mother to come back to the house.

*Appellant's testimony*

{¶20} Appellant was the sole defense witness at trial. He testified that upon his marriage to Mother and the years the family lived in Columbus, he had an excellent relationship with Jane Doe and considered her his daughter. When the family moved to Muskingum County, however, their relationship became increasingly strained; appellant said Jane would no longer obey him and he attributed this to the loss of his job and his inability to buy her things. He denied entering Jane's room during the night or harassing her during the night; he testified that he set alarms to wake him up at 3:00 a.m. due to shift jobs he worked. He also set alarms for 5:00 a.m. to remind him to go home in time for his wife to leave for work; although he became unemployed, he left the alarms set on his phone so he could help Mother and the children get up for work and school.

{¶21} On October 19, 2021, appellant testified Jane Doe was asleep in her brother's bed and the brother was in bed with Mother; he woke up with his early alarms as usual, smoked a cigarette, and sat on the couch while Mother got ready for work. Appellant said Mother tried to wake Jane Doe before she left but Jane Doe didn't get up. He then entered the room, took the blankets off her, "gave her a few gentle shakes" and told her to get up. Jane asked for five more minutes.

{¶22} Appellant said he then went to his other son's bedroom to check whether the boy wet the bed, which he had. Appellant therefore told the boy to take the sheets off

his bed, put them in the laundry room, and to take a shower. The boy got in the shower and appellant returned to check if Jane was getting up. It was now around 6:15 a.m. and appellant started laying out breakfast items while making sure both boys were up and getting ready.

{¶23} Appellant realized Jane had gone back to bed. He therefore lifted her out of the bed, intending to carry her to her own room to get ready. He testified Jane fought him by pushing and kicking him, telling him to go away. He was able to lift her and she bit him, so he dropped her back onto the bed. He denied pulling her panties down. Jane ran out of the room. Appellant testified he had a bite mark on his left shoulder and the police photographed it. He denied any sexual contact with Jane and said both boys were awake at the time and moving around in the house.

{¶24} Appellant heard Jane crying in the master bathroom and went to check on her, but the door was locked. He acknowledged he got a knife from the kitchen and forced the bathroom door open, to find Jane sobbing on the floor. He asked what was wrong and she said, "You're a fat, ugly monster; leave me alone." Appellant said this was unusual behavior but Jane "sometimes" spoke to him this way, so he picked her up and "escorted" her to her bedroom, "squeezing" her so she couldn't fight. He said he pushed her into her bedroom and closed the door, telling her to get ready for school. He denied that he did any of this for a sexual purpose, and denied that Jane locked her bedroom door or that he forced the bedroom door open.

{¶25} The boys were still getting ready for school. Appellant returned to preparing breakfast and Mother called on Jane's phone, which appellant found under Jane's bed. He did not recall his conversation with Mother although he said Jane was upset with him

and she was getting ready for school. He checked to make sure she was getting up, and she was sitting at her vanity putting makeup on. Appellant went back to making breakfast. Appellant was aware of Jane on the phone with Mother but didn't hear or attempt to listen to their conversation. Jane's demeanor was "nonchalant" and she went back to her bedroom while appellant and his sons waited for the boys' bus.

{¶26} Appellant realized Jane missed her bus and texted Mother that he would be taking Jane to school. As he waited in the driveway with his sons, though, Mother returned and waited with them. Appellant did not tell her about his argument with Jane or the bite because Mother was tired of refereeing their arguments. Appellant and Mother smoked cigarettes together on their way back to the house; there was no conversation appellant recalled. Inside, Jane was waiting with her backpack and she left with Mother.

{¶27} Appellant was "dumbfounded" when Mother returned to the house with the sheriff and C.P.S. Jane was in the deputy's car, but appellant didn't know this at the time. Morton spoke to appellant at the house and appellant complied with everything he asked.

{¶28} The investigation continued for 11 months and appellant met with a detective several times. He consented to a search of his phone because he had nothing to hide. Defense trial counsel questioned appellant about the specific texts with Jane Doe; he said he felt "married" to Jane because he fought with Mother because Mother was jealous of his attention to Jane. He gave both Mother and Jane Valentine's gifts and bought Jane flowers and jewelry. When appellant asked Jane whether she was sleeping, he meant whether she was sleeping in bed with Mother so there was no room for him. He demanded that Jane tell him that she loved him because he "demands love and respect in his household," not because he was inferring anything sexual. T. 665. Jane

stopped hugging him around the time she turned 12 and he wondered why, so he texted her song lyrics.

{¶29} Appellant acknowledged a text conversation with Jane when he noticed she was wrapped in a blanket, on the floor beside Mother's bed. He came into the room to get cigarettes and noticed Jane was on her phone, so he said he would "have to have fun by himself" in reference to video games. When he said there wasn't enough room on the floor to "have fun," he was referring to playing video games with Jane. He admitted he told Jane he "likes it when [she] scratches and bites" him, but he didn't mean anything sexual. T. 671-672.

{¶30} He acknowledged Mother was uncomfortable with the tone of his texts to Jane and told him to stop. T. 673. He denied that he ever attempted to unclothe or touch Jane, or initiate sexual contact with her.

*Indictment, trial, conviction, and sentence*

{¶31} Appellant was charged by indictment with one count of gross sexual imposition pursuant to R.C. 2907.05(A)(1) and (C)(1), a felony of the fourth degree [Count I]; one count of kidnapping with a sexual-motivation specification pursuant to R.C. 2905.01(A)(4) and (C)(1) and R.C. 2941.147(A), a felony of the first degree [Count II]; one count of attempted rape pursuant to R.C. 2923.02(A)(2) and (B), a felony of the second degree [Count III]; one count of attempted rape pursuant to R.C. 2923.02(A)(2) and (B), a felony of the second degree [Count IV]; one count of gross sexual imposition against a child under the age of 13 pursuant to R.C. 2907.05(A)(4) and (C)(2), a felony of the third degree [Count V]; one count of importuning pursuant to R.C. 2907.07(B)(1), a felony of the fifth degree [Count VI]; one count of gross sexual imposition pursuant to R.C.

2907.07(A)(1) and (C)(1), a felony of the fourth degree [Count VII]; and one count of gross sexual imposition pursuant to R.C. 2907.05(A)(1) and (C)(1), a felony of the fourth degree [Count VIII].

{¶32} Appellant entered pleas of not guilty.

{¶33} The matter proceeded to trial by jury. At the close of the first day of trial, appellant filed a written motion in limine pursuant to Evid.R. 404(B) and Evid.R. 404(A) "to exclude any portion of the forensic interview offered by [appellee] that contains references to alleged property damage and/or alleged domestic violence and/or alleged sexual conduct that occurred prior to the alleged conduct charged in the indictment." Appellee responded with a memorandum in opposition on December 14, 2022, arguing appellant's motion was untimely and that the statements contained in the video were for purposes of medical diagnosis and treatment. The trial court overruled the objection and videotape was played in its entirety. Upon admission of appellee's exhibits, appellant renewed his objection and the exhibit was admitted.

{¶34} Appellant was found guilty as charged. The trial court sentenced appellant to an aggregate indefinite prison sentence of 13 to 17 years. Appellant was also determined to be a Tier III Sex Offender and a Violent Offender.

{¶35} Appellant now appeals from the trial court's Entry of conviction and sentence filed February 2, 2023.

{¶36} Appellant raises three assignments of error:

## ASSIGNMENTS OF ERROR

{¶37} "I. SHOULD THIS HONORABLE COURT VACATE THE TRIAL COURT'S GUILTY VERDICT AND REMAND FOR A NEW TRIAL BECAUSE THE TRIAL COURT

DENIED A TIMELY OBJECTION TO EVIDENCE BEING PRESENTED UNDER EVID.R. 403(A)?"

{¶38} "II.  SHOULD THIS HONORABLE COURT VACATE THE TRIAL COURT'S GUILTY VERDICT AND REMAND FOR A NEW TRIAL BECAUSE THE TRIAL COURT DENIED A TIMELY OBJECTION TO EVIDENCE BEING PRESENTED UNDER EVID.R. 404(B)?"

{¶39} "III.  SHOULD THIS HONORABLE COURT VACATE THE TRIAL COURT'S GUILTY VERDICT AND REMAND FOR A NEW TRIAL BECAUSE THE TRIAL COURT'S DENIAL OF THE DEFENSE TIMELY OBJECTIONS BASED ON A PRETRIAL ORDER WAS AN ABUSE OF DISCRETION?"

**ANALYSIS**

I., II., III.

{¶40} Appellant's three assignments of error are related and will be addressed together. He argues that the trial court erred in admitting the videotape of Jane Doe's forensic interview in its entirety. We disagree.

{¶41} The decision to admit or exclude relevant evidence is within the sound discretion of the trial court and will not be disturbed absent an abuse of discretion. *See, State v. Combs,* 62 Ohio St.3d 278, 581 N.E.2d 1071 (1991); *State v. Sage,* 31 Ohio St.3d 173, 510 N.E.2d 343 (1987). An abuse of discretion implies more than an error of law or judgment; instead, the term suggests that the trial court acted in an unreasonable, arbitrary, or unconscionable manner. *See, State v. Xie,* 62 Ohio St.3d 521, 584 N.E.2d 715 (1992); *State v. Montgomery,* 61 Ohio St.3d 410, 575 N.E.2d 167 (1991). In addition, when applying the abuse-of-discretion standard, a reviewing court may not substitute its

judgment for that of the trial court. *In re Jane Doe I,* 57 Ohio St.3d 135, 138, 566 N.E.2d 1181 (1991).

{¶42} Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Evid.R. 801(C). As a general rule, hearsay statements are inadmissible as evidence. Evid.R. 802. There are, however, several exceptions to this rule, including the exceptions set forth in Evid.R. 803(4) and Evid.R. 807(A). Evid.R. 803 includes statements for purposes of medical diagnosis or treatment as an exception to the hearsay rule and states in pertinent part:

> **(4) Statements for Purposes of Medical Diagnosis or Treatment.** Statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment.

A child's statements made to a social worker regarding sexual abuse she experienced are admissible under Evid.R. 803(4) when made for the purposes of medical diagnosis or treatment. *State v. Muttart*, 116 Ohio St.3d 5, 2007–Ohio–5267, ¶ 39. In the context of forensic interviews of child sexual abuse victims conducted at child advocacy centers, the Supreme Court of Ohio has noted that "the interview serves dual purposes: (1) to gather forensic information to investigate and potentially prosecute a defendant for the offense and (2) to elicit information necessary for medical diagnosis and treatment of the victim.

The interviewer acts as an agent of each member of the multidisciplinary team." *State v. Arnold*, 126 Ohio St.3d 290, 2010-Ohio-2742, 933 N.E.2d 775, ¶ 33.

{¶43} To determine "whether statements made to a forensic interviewer at a child advocacy center are made for the purpose of medical diagnosis and treatment, as opposed to forensic investigative purposes, the court must 'identify the primary purpose of the statements.' " *State v. Remy*, 2d Dist. Clark No. 2017-CA-6, 2018-Ohio-2856, ¶ 82, quoting *State v. Arnold*, 126 Ohio St.3d 290, 2010-Ohio-2742, 933 N.E.2d 775, ¶ 28. "Whether the purpose of a child's statements is for medical diagnosis or treatment will depend on the facts of the particular case." *State v. Jones*, 2d Dist. Montgomery No. 26289, 2015-Ohio-4116, 43 N.E.3d 833, ¶ 73.

{¶44} Appellant argues the entire forensic interview should not have been admitted because Jane Doe made "references to domestic violence, criminal damaging, and prior bad acts" which should have been excluded pursuant to Evid.R. 403(A); the references are prohibited other-acts evidence pursuant to Evid.R. 404(B); and the trial court should have permitted the objection despite defense trial counsel's failure to raise the issue until the first day of trial.

{¶45} Appellant's argument is problematic because he does not point to specific statements when arguing the inadmissibility of the evidence and instead argues generally that Jane's statements about domestic violence and other acts of sexual abuse should not have been admitted. Appellant's brief, 3, 5, 8. We note appellant's arguments at trial were similarly unspecific and defense trial counsel sought to exclude 20 minutes of the interview without description of the objectionable statements. T. 275. Appellant's written motion in limine before the trial court states portions of the interview "allege that

[appellant] caused property damage to the home on prior occasions including a prior residence; allege an incident of domestic violence between [appellant and Mother]; and allege incidents of sexual contact with the prosecuting witness that occurred prior to the charged allegations." Motion in Limine, Dec. 14, 2022, pages 1, 3.

{¶46} The burden is upon appellant to affirmatively demonstrate error on appeal. App.R. 16(A)(7); *State v. Sims,* 10th Dist. Franklin No. 14AP-1025, 2016-Ohio-4763, ¶ 10-11. This Court is not required to search the record for evidence to support appellant's claims. *State v. Cook*, 5th Dist. No. 2015CA00090, 2016-Ohio-2823, 64 N.E.3d 350, ¶ 106, citing *Bd. of Trustees of Chester Tp. v. Baumgardner,* 11th Dist. Geauga No. 2002–G–2430, 2003-Ohio-4361, 2003 WL 21962566, ¶ 9, internal citation omitted. "If an argument exists that can support [an] assignment of error, it is not this court's duty to root it out." *State v. Colston*, 5th Dist. Muskingum No. CT2019-0076, 2020-Ohio-3879, ¶ 58, citing *Thomas v. Harmon*, 4th Dist. Lawrence No. 08CA17, 2009-Ohio-3299, at ¶ 14, internal citation omitted.

{¶47} Upon our review of the record, we included pertinent information from the forensic interview in our statement of the facts, supra. We decline to make appellant's argument for him when he has not cited to specific portions of the record, but will generally address whether the trial court erred in admitting the following portions of the videotape: Jane Doe's statements that she has seen appellant punch walls, throw chairs, and once hit Mother with a pillow; and descriptions of sexual abuse that occurred before the family moved to Muskingum County.

{¶48} Upon our review of the record, we find the cited statements were made in response to direct questions from Kaiser for the purpose of medical diagnosis and

treatment. Kaiser testified she asked Jane Doe about risk factors in the home because part of her role is formulating a safety plan; studies show domestic violence is correlated with child abuse 30-60 percent of the time; and Jane said she hasn't seen anyone hurt her mother. Jane testified to, and appellant was charged with, multiple counts of G.S.I. and importuning that occurred on dates other than October 19, 2021, when appellant came into her bed early in the morning and touched Jane and urged her to touch him. Again, appellant has not specified which statements he objects to, but we note the Jane's statements about sexual abuse that occurred prior to the move to Muskingum County were in response to questions posed by Kaiser for the purpose of medical diagnosis and treatment. Kaiser's questions to Jane during the interview included screening questions for exposure to pornography, incidents of drug use or abuse in the home, and visible acts of violence including physical discipline involving any family member; Kaiser testified these questions are part of her overall assessment of Jane for purposes of medical diagnoses, treatment, and development of a safety plan.

{¶49} Turning to appellant's arguments, he asserts the videotape in its entirety should not have been admitted because the overall effect of the interview was more prejudicial than probative. Evid.R. 403(A) states: "Although relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." In reaching a decision involving admissibility under Evid.R. 403(A), a trial court must engage in a balancing test to ascertain whether the probative value of the offered evidence outweighs its prejudicial effect. *State v. Hymore*, 9 Ohio St.2d 122, 224 N.E.2d 126 (1967), paragraph seven of the syllabus. In order for the evidence to be deemed inadmissible, its probative value

must be minimal and its prejudicial effect great. *State v. Morales*, 32 Ohio St.3d 252, 258, 513 N.E.2d 267 (1987). Furthermore, relevant evidence which is challenged as having probative value that is substantially outweighed by its prejudicial effects "should be viewed in a light most favorable to the proponent of the evidence, maximizing its probative value and minimizing any prejudicial effect" to the party opposing its admission. *State v. Maurer*, 15 Ohio St.3d 239, 265, 473 N.E.2d 768 (1984).

{¶50} Any CAC forensic interview of a child victim will be both highly prejudicial and highly probative in a case of sexual abuse, but such interviews are admissible evidence. Viewing the interview in the light most favorable to appellee, its probative value substantially outweighs any prejudice to appellant.

{¶51} Generally, Jane Doe's disclosures during the interview were reasonably pertinent to her diagnosis or treatment. *See, State v. Cook*, 3rd Dist. Union No. 14-19-26, 2020-Ohio-3411, ¶ 33. [T]he Supreme Court has "classified information regarding the identity of the perpetrator, the type of abuse alleged, the identification of the areas where the child had been touched and the body parts of the perpetrator that had touched her, as well as the time frame of the abuse, as statements for diagnosis and treatment because that information allowed the doctor or nurse to determine whether to test the child for sexually transmitted diseases, and to identify any trauma or injury sustained during the alleged abuse." *State v. C.C.B.*, 10th Dist. Franklin No. 18AP-782, 2019-Ohio-3631, ¶ 36, quoting *In re C.S.*, 10th Dist. Franklin No. 11AP-667, 2012-Ohio-2988, ¶ 14, internal citation omitted.

{¶52} The child victim's continued exposure to the perpetrator, possible contraction of a sexually-transmitted disease, the perpetrator's identity and the

psychological effect on a child are all relevant to the child's diagnosis and treatment. *Id.* Jane Doe's disclosures during the interview are relevant and pertinent to diagnosing Jane Doe, providing her with appropriate treatment, and ensuring her future safety. *Id.*

{¶53} Appellant further argues admission of the videotape violates Evid.R. 404(B), which prohibits evidence of a defendant's other acts when its only value is to show that the defendant has the character or propensity to commit a crime. Recently, in *State v. Smith*, 162 Ohio St.3d 353, 2020-Ohio-4441, 165 N.E.3d 1123 at ¶¶ 36-38 the Supreme Court of Ohio stated:

> Evid.R. 404(B) categorically prohibits evidence of a defendant's other acts when its only value is to show that the defendant has the character or propensity to commit a crime. Other-acts evidence may, however, be admissible for another non-character-based purpose, such as "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." *Id.* "The key is that the evidence must prove something other than the defendant's disposition to commit certain acts." *State v. Hartman*, 161 Ohio St.3d 214, 2020-Ohio-4440, 161 N.E.3d 651, ¶ 22.
>
> In *Hartman*, we provided a guide for courts to evaluate proposed other-acts evidence to determine whether the evidence connects to a permissible purpose without relying on any improper character inferences. The threshold question is whether the evidence is relevant. Id. at ¶ 24; Evid.R. 401; see also *State v.*

*Williams*, 134 Ohio St.3d 521, 2012-Ohio-5695, 983 N.E.2d 1278, ¶ 20. As we explained in *Hartman*, the problem with other-acts evidence is rarely that it is irrelevant; often, it is too relevant. *Hartman* at ¶ 25; see 1A Wigmore, Evidence, Section 58.2, at 1212 (Tillers Rev. 1983). In the Evid.R. 404(B) context, the relevance examination asks whether the proffered evidence is relevant to the particular purpose for which it is offered, as well as whether it is relevant to an issue that is actually in dispute. *Hartman* at ¶ 26-27; see also *Huddleston v. United States*, 485 U.S. 681, 686, 108 S.Ct. 1496, 99 L.Ed.2d 771 (1988).

{¶54} Thus, courts should begin by evaluating whether the evidence is relevant to a non-character-based issue that is material to the case. If the evidence is not premised on improper character inferences and is probative of an issue in the case, the court must then consider whether the evidence's value "is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." Evid.R. 403(A); *Hartman* at ¶ 29. Because other-acts evidence " 'almost always carries some risk that the jury will draw the forbidden propensity inference,' " courts should be vigilant in balancing the prejudicial impact of the evidence against its probative value. *Id.* at ¶ 33, quoting *United States v. Gomez*, 763 F.3d 845, 857 (7th Cir. 2014) (en banc).

{¶55} In the instant case, appellant has not identified the specific other-acts evidence of which he complains. Upon our review of the record, the references to appellant punching holes in walls, hitting Mother with a pillow, and committing other acts of sexual abuse were fleeting and appellee did not dwell on the statements in the

interview. Appellee certainly did not use statements in the forensic interview as character or propensity evidence, and appellant points to no such use of the evidence. Instead, it was defense trial counsel who asked Kaiser about the statistical relationship between domestic violence and other types of abuse, and questioned why Kaiser marked "other sexually deviant activity" in her notes, drawing attention to the disputed portions of the video. T. 304-306.

{¶56} Even if we find the fleeting references to other bad acts to have been impermissible evidence that should have been redacted from the video, we find the admission to be harmless error. If a court finds that evidence was inadmissible under Evid. R. 404(B), the court can still determine that the error was harmless. The Supreme Court of Ohio has held that error is harmless if "there is no reasonable possibility that the evidence may have contributed to the accused's conviction." *State v. Drew*, 10th Dist. No. 07AP-467, 2008-Ohio-2797. at ¶ 31, quoting *State v. Bayless*, 48 Ohio St.2d 73, 357 N.E.2d 1035 (1976), paragraph seven of the syllabus. Moreover, it is appropriate to find error harmless where there is "either overwhelming evidence of guilt or some other indicia that the error did not contribute to the conviction." *State v. Ferguson*, 5 Ohio St.3d 160, 166, fn. 5, 450 N.E.2d 265 (1983). "When considering whether error is harmless, our judgment is based on our own reading of the record and on what we determine is the probable impact the statement had on the jury." *State v. Drew*, supra, citing *State v. Kidder*, 32 Ohio St.3d 279, 284, 513 N.E.2d 311 (1987).

{¶57} We find any error in admission of the entire forensic interview to be harmless. In the instant case, Jane Doe gave consistent, unwavering accounts of appellant's sexual abuse, and her accounts were corroborated in key details by

appellant's own words in the text messages and by his own dubious testimony. Appellant was inconsistent in his explanations both at trial and during the investigation. See, *Timm, supra.*

{¶58} We note that harmless error is described as "[a]ny error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded." Crim.R. 52(A). Error is harmless beyond a reasonable doubt when the remaining evidence constitutes overwhelming proof of the defendant's guilt. *State v. Williams*, 38 Ohio St.3d 346, 349–350, 528 N.E.2d 910 (1988). Overcoming harmless error requires a showing of undue prejudice or a violation of a substantial right. *State v. Granderson*, 5th Dist. No. 2007CAA-01-0005, 177 Ohio App.3d 424, 2008-Ohio-3757, 894 N.E.2d 1290, ¶ 78, citing *State v. Lockhart,* 5th Dist. No. 06CAA100080, 2008-Ohio-57, 2008 WL 94733.

{¶59} Finally, appellant argues the trial court's pretrial order did not prohibit a timely objection during trial. As Kaiser testified, appellee prepared to play the videotape of the forensic interview and defense trial counsel objected on the record. Appellant also filed a written motion in limine to which appellee responded in writing. The motion in limine argued the tape of the forensic interview should be excluded for the same reasons appellant has argued on appeal, to wit, relevancy pursuant to Evid.R. 403(A) and impermissible other-acts evidence pursuant to Evid.R. 404(B). The trial court questioned defense counsel how long she had the video in her possession and counsel admitted she received it during initial discovery, but didn't raise an objection earlier because she didn't think appellee would admit the entire video. T. 277, 283-284. The trial court overruled appellant's objection, but preserved it for the record and permitted counsel to file written motions. We note appellant has not assigned ineffective assistance of counsel as error.

The untimely objection was heard, argued, and preserved. We therefore fail to find the trial court erred in reminding defense trial counsel that the arguments should have been raised within the trial court's deadline of 14 days prior to trial.

{¶60} Appellant's three assignments of error are overruled.

## CONCLUSION

{¶61} Appellant's three assignments of error are overruled and the judgment of the Muskingum County Court of Common Pleas is affirmed.

By: Delaney, J.,

Gwin, P.J. and

King, J., concur.